## THE AILSA.

## THE BOURGOGNE.

## ATLAS S. S. CO. v. THE BOURGOGNE.

## LA COMPAGNIE GENERALE TRANSATLANTIQUE v. THE BOUR-GOGNE.

## WESTERN ASSUR. CO. v. THE BOURGOGNE et al.

## WHEELER v. THE AILSA et al.

(District Court, S. D. New York. November 6, 1896.)

COLLISION—FOG—ANCHORING IN CHANNELWAY—CHOICE OF ANCHORAGE GROUNDS —LETTING CHAIN RUN.

The S. S. Ailsa, outward bound from New York, anchored in the channel-way in dense fog a little below Ft. Lafayette. The customary anchor-age of vessels outward bound was in Gravesend Bay to the eastward of the A.'s place of anchorage. The large steamship Bourgogne, going down about an hour afterwards, and seeking anchorage at Gravesend Bay, ran into the A. *Held* (1) that the Ailsa was in fault for negligent navigation in not going within anchorage limits, having means of knowledge, both by soundings and by the course of other vessels passing near her, that she was off of anchorage ground and in an improper position, and also for not letting her chain run when the B. was seen approaching; (2) that the B., having no reason to expect any vessel to be anchored in the channelway, had a right to proceed to the anchorage in Gravesend Bay just below Ft. Lafayette, the customary and appropriate anchorage ground for vessels of her class; and that she was not in fault for not anchoring at a less con-venient and appropriate place above the Fort.

Wheeler & Cortis, for Atlas S. S. Co.
Jones & Govin, for La Bourgogne.
Butler, Notman, Joline & Mynderse, for Western Assur. Co.
Jesse Johnson, for Charles P. Wheeler.

BROWN, District Judge. The above libels were filed to recover damages for injuries arising from a collision between the steamships Bourgogne and Ailsa at a little after 2 o'clock in the afternoon of February 29, 1896, during a dense fog about half a mile below the Narrows in New York harbor. Both steamers were outward bound. The Ailsa, 1,330 tons register, 297 feet long, had left her pier in North River about noon, and finding thick fog at the Narrows came to anchor. The Bourgogne, a much larger steamer, 475 feet long, left her pier in the North River at 1:13 p. m. The tide was strong ebb. She was backed out from the pier, and turned with the aid of tugs and got straightened on her course down river at 1:37. On starting the weather was somewhat misty or rainy, but without fog until near Robbins Reef, where fog was seen mostly on the west shore, the easterly shore being much clearer. Off Quarantine only the masts of vessels could be seen, and the high ground above. Fort Lafayette was shrouded in fog, but the cliff above Fort Hamilton and the houses around it were clearly visible. Before reaching Fort Lafayette the pilot had determined to anchor in Gravesend Bay, just below the Fort. From the time occupied, it is evident that the Bourgogne must have proceeded nearly to Fort Lafayette at almost her full speed, or about 16 knots. On encountering the thicker fog there, or a little above, she slowed, and soon stopped her engines. She was then nearly in mid-channel, and soon after starboarded her wheel in order to go towards Gravesend Bay for anchorage. Soon afterwards the masts of the Ailsa were seen nearly directly ahead, but a little on the port bow, and only a short distance away, probably not over one or two lengths away. The Bourgogne's wheel was immediately put to port and her engines reversed. Her stem, however, struck the port bow of the Ailsa at an angle, as the evidence indicates, of about two points, and made a hole in the Ailsa about 6 feet inboard and about 16 feet in length, fore and aft. The Bourgogne almost immediately backed away under the influence of her reversed engines, and in the fog and ebb tide was carried down about a half a mile below, where she anchored.

The wound in the Ailsa extended below the water line. Her officers almost immediately perceiving that she was making water rapidly, hove anchor and started ahead under full speed of her engines, for the purpose of beaching the ship on the land in a northeasterly direction. Soon after she got under way, the steamer Advance, coming down upon a course S. by E., made it necessary for the Ailsa to stop and back her engines to allow the Advance to pass ahead of her, after which the Ailsa continued on, passing the stern of the Advance, but soon sinking, bow first. The point where she sank was afterwards located as 1,800 feet S. by E., $\frac{1}{2}$ E. from the easterly side of Fort Lafayette.

The witnesses on the part of each steamer testify that their own steamer gave the statutory signals, but neither heard any signals of the other until seen very near. On the part of the Ailsa it is claimed that the collision arose by the fault of the Bourgogne: (1) In not anchoring before passing Fort Lafayette, and in unnecessarily going below the Fort in thick fog; (2) for excessive speed in fog; (3) for not having a proper lookout and not giving proper signals. For the Bourgogne it is claimed (1) that the Ailsa is alone to blame for having anchored unnecessarily in the channel-way where vessels seeking anchorage must be expected to pass, instead of going further to the eastward, within the anchorage limits of Gravesend Bay, as required by the regulations of the Secretary of the Treasury; (2) for not giving the statutory signals; (3) for not letting out her chain when the approach of the Bourgogne was seen.

1. From the best consideration I have been able to give to this case, the clear weight of evidence, both from the direct testimony and from numerous circumstances, seems to me to show that the Ailsa was anchored in the channel-way to the westward of the prescribed anchorage limits.

(a) Her witnesses were not able to testify that she was actually on anchorage ground.

(b) Her pleadings do not aver that she was.

(c) The account of her navigation below Fort Lafayette indicates that she was not on anchorage limits. The westerly anchorage line runs southward from the easterly angle of Fort Lafayette, about parallel with the usual channel course, viz., S. x E. The Ailsa passed Fort Lafayette, presumably on that course, and as her officers estimate, only 100 yards to the westward of the Fort (though the distance may have been more than that), and therefore at least 600 or 700 feet from the anchorage line, and very possibly more. Afterwards, and just before the Ailsa turned to anchor, she was observed by the pilot, as he testifies, to be heading S. S. W. by her compass, or 3 points to the westward of the anchorage line; in fact 3½ points, as her compass, according to the captain's testimony, had a half point's easterly variation. How long or far the Ailsa had been running on a course of S. S. W. ¼ W. (mag.) it is impossible to determine; because the testimony is meagre and inharmonious as regards her course below Fort Lafayette. The pilot says he gave the captain the course of S. x E., which it was the captain's business to give to the quartermaster; the captain says the pilot gave no course, and that he himself did not observe the compass; and the quarter-master was not examined. It is difficult to reconcile these statements; but as the ship must have been steered by compass, it is probable that the course which the quartermaster got was S. x E.; and this, being S. ½ E., true magnetic, would all the time carry the Ailsa more to the westward of the anchorage line, viz., ¼ point net, taking the drift of the tide into account. Some 3 or 4 minutes after passing Fort Lafayette the engine was stopped, and after some drifting the pilot observed the Ailsa's heading to be S. S. W. by her compass (S. S. W. ½ W.) The pilot thinking that from this heading she was too far out in the channel to

anchor there, hard-starboarded her helm, "gave her engines a couple of turns forward to give her head a twist to port, then stopped and afterwards reversed; and when her head had by these means been swung to S. E. (S. E. $\frac{1}{2}$ S.) and her headway stopped, and being then about a half mile below Fort Lafayette, he dropped anchor, and there remained until collision." This evidence taken altogether does not seem to me to indicate any probability that by her turn to S. E. from her heading of S. S. W., she would more than regain her previous position of 600 or 700 feet west from the anchorage line when passing Fort Lafayette.

(d) The testimony of the Bourgogne's witnesses would place the Ailsa's anchorage much more to the westward. The Bourgogne passed Fort Lafayette, as estimated by her pilot, in mid-channel, i. e. at least 2,000 feet to the west of the Fort, and he was then on a true compass course of S. x E., which he says was maintained until her helm was starboarded to go to anchor; and very shortly after this, and before her head had made much of any change, the Ailsa's masts were seen very near, and the collision was nearly head and head. If the Ailsa was on anchorage ground, this account of the Bourgogne's navigation must be very far from correct.

(e) The testimony as to the bearing of the bell at Fort Lafayette, heard on the Ailsa while she was at anchor, indicates an anchorage considerably to the westward of the anchorage line. Her pilot says that he heard the sound of the bell, and that it bore N. or N. x E. Had the Ailsa anchored upon the extreme westerly anchorage line, the bell of the Fort would have borne N. x W. To have the bell bear N. or N. x E., the Ailsa, being half a mile below the Fort, must have been in a position from 600 to 1,200 feet west of the anchorage limits.

(f) The testimony of Captain Cooley of the Harold, a witness called for the Ailsa, would place her position still further to the westward. He says he came upon the westward beam of the Ailsa, and was hailed by her when about 150 feet off, while she was raising her anchor, and while he was moving slowly, heading N. N. E.; and that while on that heading he heard the bell of Fort Lafayette a little on his starboard bow. This would be quite impossible unless the Ailsa was considerably to the westward of the anchorage line, and it would locate her about S. S. W. from Fort Lafayette. It is, of course, possible that Captain Cooley's testimony may have been based on his notice of the Fort bell at a time before getting abreast of the Ailsa, rather than at that particular moment. But as he was moving very slowly, and heading N. N. E., a difference of a few minutes in the time of his observation would not greatly change the Ailsa's position. As this observation is wholly independent of that of pilot Shooks, and agrees with it in a general way, though exactness is not to be ascribed to either, both together are not without considerable weight.

Captain Cooley further states that when the Ailsa got under way "she started to go across the channel to make Gravesend Bay," plainly implying that she was then in the channel and not on anchorage ground.

(g) Again, the Pacific Mail Steamship Advance, outward bound, crossed the bow of the Ailsa after the latter had started from her

anchorage, and went to the eastward of the Ailsa; the testimony of her master is that the Advance was then upon a course S. x E., which she had kept after passing within 300 feet of Fort Lafayette. If this is correct, the Ailsa must have anchored to the westward of that S. x E. course, and hence considerably to the westward of the anchorage limits.

(h) The Ailsa's testimony shows that within an hour after she anchored, three steamships passed very near her, one going up on the westward side of her, and two going down on the eastward side, all three within 100 or 200 feet of her, while the Bourgogne, the fourth, ran into her. This affords strong presumptive evidence not only that the Ailsa anchored right in the usual pathway of vessels going to that anchorage, but that she was not herself on anchorage ground; since it is highly improbable that a steamer going up would be on, or so near to, anchorage ground, and outside of a channel way over 4,000 feet wide; and equally improbable that three other vessels seeking anchorage on anchorage grounds two miles long by a half mile wide, should all go so nearly in the same track, except while they were going towards the anchorage ground, and before they had reached it.

2. Opposed to the above considerations, it is claimed for the Ailsa, in the absence of direct proof, that she must have been anchored upon anchorage ground, because the place where she sank was within anchorage limits; and it is claimed (a) that she traversed but a very short distance in going there from her place of anchorage; (b) and that she anchored in only 8 fathoms of water; which it is said is not to be found outside of anchorage limits.

The careful location by Prof. Compton, as well as by the master's observation, fixes the place where she sank at 1,800 feet S. x E, ½ E. (mag.) from the eastern angle of Fort Lafayette. This would make her about 200 feet, or less, inside, i. e. to the eastward, of the anchorage line. The testimony, however, is so inharmonious as to the length of time that the Ailsa was under headway after she started from her anchorage, and until she sank, that almost any estimate of time and the distance traversed can find some support in the evidence. The testimony that seems to me entitled to the most weight, and most likely to be approximately correct, is that of the pilot Shooks, and of Captains Morris and Cooley. Though there is some indefiniteness and variation in their testimony, the fair result of it is that they estimate the interval between the collision and the sinking to be from 10 to 15 minutes, say, as a medium, 12 minutes, of which about 4 minutes were occupied in getting under way; that the Ailsa ran under full speed steam pressure for the remaining time, say 8 minutes, except a delay, which could not have exceeded 2 minutes, during which she reversed in order to go astern of the Advance. This would give about 6 minutes that her engines were moving ahead full speed. In her behalf it is contended, that in her disabled condition, with a large hole in her bow, and her bow always sinking lower from the inflowing water, she could not have made an average of over 4 or 5 knots through the water. Assuming this to be so, she would have moved in the estimated interval somewhere from 2400 to 3000 feet through the water. But as the tide was setting southerly at the rate of from 1½

to 2 knots, this would carry her down during the interval of 8 minutes, somewhere from 1,200 to 1,600 feet.

Allowing as most favorable to the Ailsa, only 6 minutes for her full speed ahead, and an average speed of only 4 knots, and 8 minutes for the time she was subject to the set of the tide S. x E. at the rate of 1¾ knots, and taking her average heading to have been N. x E., as the captain thought she was heading when the Advance passed (though the order was to take an N. E. course) and a tracing will show that upon these assumptions, as favorable as possible to the Ailsa, her necessary course over the ground, to the place where she sank must have been 2 points more to the eastward than her actual heading, i. e., N. E. x N., and her place of anchorage about 1,300 feet S. W. x S. from the point "S" on Prof. Compton's diagram, as the place where she lay sunk. This would make her anchorage over 900 feet westerly from that point, and at least 700 feet outside of the anchorage limits. This independent result not only agrees closely with the testimony of Captain Cooley and pilot Shooks, as to the bearing of the bell on Fort Lafayette, but it accords with the Ailsa's estimated distance of the place of anchorage below the Fort. Nor is there any possible way by which the Ailsa, consistently with the testimony, could have reached the point where she sank, from an anchorage a half mile below Fort Lafayette, had her anchorage been inside the anchorage limits. If her average speed through the water was, say, 6 knots instead of 4, and the tide only 1½ knots; and if her engines were running ahead only 5 minutes, with the loss of two additional minutes for the Advance, her heading being taken as N. x E., as before, her course over the ground must have been N. N. E., and her anchorage must have been over 2,000 feet S. W. from the place where she sank, and more than ½ mile from Fort Lafayette; and her distance outside of the anchorage ground would be greater than above estimated. The evidence pertaining to the navigation of the Ailsa, therefore, to my mind very persuasively confirms the other evidence that she anchored considerably to the westward of the prescribed anchorage limits, and seems to me wholly incompatible with the contrary contention.

4. When the anchor was dropped it touched bottom with 15 fathoms of chain, besides the anchor length. The master and carpenter testify that there were from 4 to 5 fathoms only of that chain above the water line, which would give from 70 to 80 feet of water at the place of anchorage. One witness, the superintendent, who was not on board the ship, testifies that the distance from the windlass by measurement to the top of the water was seven fathoms, which would leave but 50 to 60 feet of water at the place of anchorage. As the ship was sunk, I understand this testimony to refer to some measurement on the plan of the ship. I am unable to verify it. Such a measurement of plans must assume some data, and these may not have been in accord with the facts. However that may be, such a single item of testimony from a witness not on board, and not knowing the position of the 15 fathom shackel, cannot outweigh so many circumstances as

those above noted, if there is any real discrepancy with this witness's measurement, of which, however, there is no certain proof.

5. The conclusion that the Ailsa was anchored much outside of anchorage limits, and right in the pathway of vessels seeking customary anchorage, fixes upon her the primary responsibility for the collision, within the settled adjudications. No existing circumstances justified her anchoring at that place. Upon the testimony both of her master and her pilot, her navigation below Fort Lafayette, without either of them having observed the compass until the pilot found the Ailsa's heading to be S. S. W., 3½ points off her course, was unaccountably negligent. The Ailsa drew but 20 feet of water, and when she anchored from 500 to 1,000 feet to the westward of anchorage ground, she had a half mile of clear good water to the eastward, and a much further space to the southward within anchorage limits. The plea that bells heard from other steamers made it imprudent for her to go on further than she did, cannot be accepted; because the evidence shows that at the time she anchored there were no other steamers within a half mile of her, and these were much to the southward. Nothing could have been present to indicate to her any danger in going from a quarter to a half mile further to the eastward had she wished to go upon anchorage ground as it was her duty to do. Strout v. Foster, 1 How. 90–92; The Scioto, 2 Ware, 360, 368, Fed. Cas. No. 12,508; The Bedford, 5 Blatchf. 200, Fed. Cas. No. 1,216.

6. Another circumstance made it specially blamable in the Ailsa to anchor where she did, viz., the fact that the day was Saturday, an outgoing steamer day, and that the Ailsa was comparatively early, and in advance of other steamers that were certainly to be expected later. Ordinary prudence under such circumstances would require a light draft vessel like the Ailsa to go well to the eastward, out of the way of later-coming vessels of deeper draft. If she did not know her position, soundings would have sufficiently given it; and the first steamer that passed so near her on a S. x E. course, was notice to her that she was off of anchorage ground and in an improper and dangerous position.

7. A further fault in the Ailsa was that no attempt was made to let her chain run when the Bourgogne was seen approaching. No order to that effect was given, nor was there any person on the forecastle to execute such an order, if given. A single blow would have released the anchor chain. A second later and the Ailsa would have begun to move astern; and the collision, I am persuaded, would have been thereby avoided. The case of The Richmond, 12 C. C. A. 1, 63 Fed. 1020, 1022, was in this regard similar to the present case; and the anchored vessel was there held in fault by the Court of Appeal on the single ground of the omission to give more chain.

### The Bourgogne.

8. The direct testimony and the circumstances indicate that at the time when the Ailsa was first seen, the Bourgogne was going

quite slowly, not above 3 or 4 knots through the water. She was not violating the rule requiring that a vessel under way in fog shall go at "moderate speed." She was going to the anchorage ground of Gravesend Bay, the most spacious, the most convenient, and the most usual anchorage ground for vessels outward bound; and if she was not in fault for seeking that anchorage, her speed of 2 to 4 knots through the water, kept up by occasional turns of the engine with frequent stops, was not only moderate, but evidently as slow as was compatible with any proper handling of so large a ship. The collision was nearly head and head. Yet the impact of collision was not violent, but comparatively gentle. There was no shock; no breaking of anchor, chain, or windlass; though the Ailsa, held fast by her anchor, received the Bourgogne's stem with the whole weight of 5,000 tons of ship and cargo, behind it. Nevertheless the wound extended but 6 feet inboard, and 16 feet on the line of the Ailsa's keel; and the Bourgogne, all the time backing her engines went immediately clear without any entanglement. From these circumstances, in connection with the direct evidence, I have no doubt that a speed of 2 knots by the Bourgogne was abundantly sufficient to cause such a wound as the Ailsa exhibits; that the way of the Bourgogne through the water was therefore substantially stopped at collision, as her officers testify; and that her impact was scarcely more than by the drift of the tideway; so that if chain had been given, the collision would have been avoided.

There can be no question that a good lookout was kept up on the Bourgogne; that the Ailsa was seen and reported as soon as she could be seen; that the Bourgogne at once reversed, and as I judge stopped her way through the water before collision, from a previous speed of not more than 3 or 4 knots. This she would do on reversal in going from about 350 to 500 feet, including the tide (The Normandie, 43 Fed. 161); and this, according to the evidence, is about the distance she was away when the Ailsa was discovered. The Bourgogne's account is credible and probable, and I do not find any fault proved in these respects.

Why the Ailsa's bell was not sooner heard, if properly rung; and why the Bourgogne's whistle was not sooner heard on the Ailsa, if a proper watch was kept up, it is not necessary to consider, as I am satisfied that the evidence does not show any fault of the Bourgogne in either regard.

The contention that the Bourgogne should have anchored above Fort Lafayette, and that her omission to do so was a legal fault, which makes her responsible for the collision, though strenuously urged by counsel, seems to me not well founded. Anchorage along part of the Staten Island shore above Fort Lafayette by outward bound vessels was forbidden. There was not any such apparent necessity as would authorize the steamer to disobey the regulation. She might, indeed, have anchored on the Long Island side, a half mile or more above Fort Lafayette, instead of seeking the anchorage in Gravesend Bay just below the Fort. But, as just observed, there was no apparent necessity for immediate anchor-

age. Though Fort Lafayette was obscured, the cliffs on each shore were visible, and there was no difficulty, therefore, in making her way to the larger, more convenient, and more usual anchorage below. In going there she had no reason to expect any vessel to be anchored in her way outside of anchorage ground; and the area there was so spacious that there was less liability of encountering other vessels there, while going to anchorage, than in narrower limits. The lower anchorage was, moreover, much better adapted to the great size of the Bourgogne than the ground above the Fort, where there was not breadth of water sufficient to enable her to turn around conveniently without the aid of tugs. Greater nearness to the tortuous channels below, and a better view of the conditions of the weather there, where the chief obstacles exist to getting out to sea, are additional reasons which with its broad extent have made Gravesend Bay the natural and customary anchorage in such cases. In the absence of any apparent necessity to anchor immediately, or of any notice or reason to believe that other vessels would be in her way in going to Gravesend Bay, I think the Bourgogne was entitled to take these circumstances into consideration in determining to which of two anchorage grounds so near each other she should resort, and to go to Gravesend Bay as she did. And if the question is to be judged as a question of prudent management, the fact that most of the large steamers, if not all, that went out that day, sought the same anchorage in Gravesend Bay, and none, so far as appears, on the Long Island shore above the Fort, is strong evidence that the pilots of these steamers, who are the most competent judges, all concurred in the propriety of going to the lower anchorage.

The presumption of fault as against a steamer colliding with another at anchor, does not arise where the latter is anchored in an improper place, where no such vessel is to be expected to be found at anchor, and where the moving vessel has no notice, actual or presumptive, of the other's presence in time to avoid her.

There is no satisfactory proof that at the time when the Ailsa passed Fort Lafayette the fog was any less dense than when the Bourgogne passed it. The first officer of the Ailsa, who was on the forecastle, says he could not see the Fort because the fog was so thick, though the Ailsa, as her pilot says, passed the Fort only about 100 yards distant. In similar fog, therefore, the Ailsa, though a much smaller vessel, and with less reason than the Bourgogne had, went for the Gravesend Bay anchorage; and she cannot be entitled to much credit when she urges that that act was so rash as to constitute a legal fault. This contention rests on the argument of counsel, and not upon any expert testimony. And it is too much to ask the Court to pronounce such a judgment in the absence of any expert evidence whatever, and in opposition to the practical testimony of so many pilots acting under so high responsibilities.

I think there should be decrees in favor of the Bourgogne, and against the Ailsa as the responsible cause of the collision.