LA BOURGOGNE

THE AILSA.

ATLAS S. S. CO., Limited, v. LA CAMPAGNIE GENERALE TRANSATLANTIQUE. WHEELER v. ATLAS S. S. CO., Limited, et al. WESTERN ASSUR. CO. OF TORONTO et al. v. SAME.

(Circuit Court of Appeals, Second Circuit. April 7, 1898.)

Nos. 21–23.

1. COLLISION—FOG—ANCHORING IN CHANNEL.
Where a vessel in a dense fog anchors in New York Harbor outside of anchorage limits, and in the track of vessels seeking anchorage, and, while there, has means of knowledge, by reason of the passing of other vessels, that she is in the channel. she is in fault if another vessel, acting in a prudent manner, seeking anchorage in the customary and appropriate ground, runs into her.

2. SAME.
Where a vessel outward bound from New York encounters a fog before reaching the Narrows, and decides to anchor, but, instead of anchoring above the Narrows, goes on through to find anchorage in Gravesend Bay, a natural, wide, and favorite anchorage ground (a course followed by other vessels about the same time during the same fog), and on leaving the Narrows to go to anchorage in the bay, while acting with the usual precautions, runs into another vessel anchored in the channel, she is not at fault.

These three appeals are from the decrees of the district court for the Southern district of New York, which dismissed three libels against the steamship Bourgogne, for damages arising from a collision. The first libel was by the owner of the injured vessel; the second was by one of her passengers; and the third was by the insurers and owners of her cargo.

The general facts in regard to the collision are accurately stated by Judge Brown, as follows (76 Fed. 868):

The above libels were filed to recover damages for injuries arising from a collision between the steamships Bourgogne and Ailsa at a little after 2 o'clock in the afternoon of February 29, 1896, during a dense fog for about half a mile below the Narrows, in New York Harbor. Both steamers were outward bound. The Ailsa, 1,330 tons register, 297 feet long, had left her pier in North river about noon, and, finding thick fog at the Narrows, came to anchor. The Bourgogne, a much larger steamer, 475 feet long, left her pier in the North river at 1:13 p. m. The tide was strong ebb. She was backed out of the pier, and turned with the aid of tugs, and got straightened on her course down river at 1:37.

On starting, the weather was somewhat misty or rainy, but without fog, until near Robbins' Reef, where fog was seen mostly on the west shore, the easterly shore being much clearer. Off Quarantine only the masts of vessels could be seen, and the high ground above. Ft. Lafayette was shrouded in fog, but the cliff above Ft. Hamilton and the houses around it were clearly visible. Before reaching Ft. Lafayette, the pilot had determined to anchor in Gravesend Bay, just below the fort. From the time occupied, it is evident that the Bourgogne must have proceeded nearly to Ft. Lafayette at almost her full speed, or about 16 knots. On encountering the thicker fog there, or a little above, she slowed, and soon stopped her engines. She was then nearly in mid-channel, and soon after starboarded her wheel, in order to go towards Gravesend Bay for anchorage. Soon afterwards the masts of the Ailsa were seen nearly directly ahead, but a little on the port bow, and only a short distance away, probably not over one or two lengths away. The Bourgogne's wheel was immediately put to port, and her engines reversed. Her stem, however, struck the port bow of the Ailsa at an angle, as the evidence indicates, of about two points; and made a hole in the Ailsa about 6 feet inboard, and about 16 feet in length, fore and aft. The Bourgogne almost immediately backed away under the influence of her reverse engines, and, in the fog and ebb tide, was carried down about half a mile below, where she anchored. The wound in the Ailsa extended below the water line. Her officers, almost immediately perceiving that she was making water rapidly, hove anchor, and started ahead, under the full speed of her engines, for the purpose of beaching the ship on the land in a northeasterly direction. Soon after she got under way, the steamer Advance coming down upon a course S. by E. made it necessary for the Ailsa to stop and back her engines to allow the Advance to pass ahead of her, after which the Ailsa continued on, passing astern of the Advance, but soon sinking, bow first. The point where she sank was afterwards located as 1,800 feet S. by E., ½ E., from the easterly side of Ft. Lafayette. The witnesses on the part of each steamer testify that their own steamer gave the statutory signals, but neither heard any signals of the other until seen very near. On the part of the Ailsa it is claimed that the collision arose by the fault of the Bourgogne (1) in not anchoring before passing Ft. Lafayette, and in unnecessarily going below the fort in thick fog; (2) for excessive speed in fog; (3) for not having a proper lookout, and not giving proper signals. For the Bourgogne it is claimed (1) that the Ailsa is alone to blame for having anchored unnecessarily in the channel way where vessels seeking anchorage must be expected to pass, instead of going further to the eastward within the anchorage limits of Gravesend Bay, as required by the regulations of the secretary of the treasury; (2) for not giving the statutory signals; (3) for not letting out her chain when the approach of the Bourgogne was seen.

Everett P. Wheeler, for Atlas S. S. Co.
Wilhelmus Mynderse, for Western Assur. Co.
Lamb & Johnson, for Charles B. Wheeler.
Robert D. Benedict and Edw. K. Jones, for La Bourgogne.

Before WALLACE, LACOMBE, and SHIPMAN, Circuit Judges.

SHIPMAN, Circuit Judge (after stating the facts as above). The questions in regard to the Bourgogne's excessive speed, and her not having a proper lookout, and her not giving proper signals, and in regard to the Ailsa's not giving the statutory signals, may be laid out of the case. The evidence is that each vessel did her duty, and complied with the statutes in these particulars. The two important questions in the case are whether the Ailsa was anchored in the channel way to the westward of the prescribed anchorage limits, and was, under the circumstances of the case, in an improper place, and whether the Bourgogne was guilty of negligence in not having sooner understood the importance of coming to anchor, and in not anchoring above Ft. Lafay-

ette. Judge Brown has given with great care the testimony in regard to the navigation of the Ailsa, and the deductions from it which assisted him to a result which freed the Bourgogne from liability. As we have reached the same result in regard to the two vital questions, we do not deem it necessary to review with minuteness the items of the testimony in that part of the case, for there are other facts which seem to us also important upon the question of her location after she was anchored, which can be stated briefly.

The libel, after stating the facts in regard to the weather, and that it was imprudent for the vessel to continue any further, averred that she "thereupon left the mid-channel, and was anchored as close to the Ft. Hamilton shore as was deemed prudent in order to be out of the way of vessels proceeding through the Narrows," and that the collision was caused solely by the negligence and want of proper care on the part of the Bourgogne. Inasmuch as the moving steamship had collided with a vessel at anchor, and therefore powerless to help herself, it was incumbent upon the ship in motion to take the burden of freeing herself from this charge of negligence, for the presumptions were prima facie against her; and, if the vessel was anchored in an improper place, the colliding vessel should show that she could not be avoided by the use of due care. The Annot Lyle, 11 Prob. Div. 114; The Bothnia, Lush. 52; The Batavier, 2 W. Rob. 407; The Lochlibo, 3 W. Rob. 310. The claimant denied in its answer that the Ailsa was anchored as close to the Ft. Hamilton shore as was deemed prudent, and denied that the collision was caused solely by the fault of the Bourgogne, but charged that it was caused by several faults of the Ailsa, among which was anchorage in an improper and unsafe place. The Bourgogne, having admitted that she, a steam vessel in motion, had collided with a vessel at anchor, must clearly show a sufficient excuse for such conduct; and one part of her excuse was the alleged fact that the place of anchorage was so much westward of the anchorage line, which had been designated by the secretary of the treasury, as to be in the way of vessels who were also trying to anchor. When the Bourgogne had clearly shown this, and the misconduct of the Ailsa was "fully made out by the proof" (Strout v. Foster, 1 How. 89), the Bourgogne had partially freed herself from the strong presumptions of faulty conduct which would otherwise have rested upon her. The duty, however, remained upon her of showing that she could not see and did not hear that the Ailsa was in front of her, because, to use Dr. Lushington's illustration, it does not follow that, because a motionless carriage is on the wrong side of the road, it can be injured with impunity by the driver of a moving carriage, who sees and can avoid the obstruction. The Batavier, supra; The Clarita, 23 Wall. 1.

In this case, as will hereafter be more particularly noticed, although the Ailsa left New York pier about an hour before the Bourgogne, the two vessels were compelled to seek an anchorage under about the same circumstances. The Ailsa knew the importance of coming to anchor, and says that she left the mid-channel, and that she attempted to be out of the way of vessels proceeding through the Narrows. She did anchor about half a mile below Ft. Lafayette. The Bourgogne says that she left the mid-channel under the same necessity for the purpose

of anchoring in the bay below Ft. Lafayette. Each knew the importance of keeping out of the way of moving vessels, and each knew that, for the purpose of safety in the crowded harbor of New York, anchorage grounds had been provided, but that in the darkness it was difficult to know with certainty where they were, and therefore each knew the necessity of caution. In this position of affairs, it is of some significance that no one on board the Ailsa, and no one in her behalf, testified that she was on anchorage ground. Her pilot, who presumably was familiar with the anchorage lines, says:

"We were on the eastern side of the channel. I couldn't exactly state whether we were on the inside of the line or on the line, because there was a dense fog, but we were somewhere on the line or near the line."

There was an especial obligation upon him to exercise caution, and to try to have some certainty of belief upon this subject, because he was seeking for anchorage by reason of a fog on the afternoon of Saturday, when outgoing ocean steamers are always numerous, when the harbor was full of vessels of all kinds, and when he was hearing abundant signals of warning. After the calamity, and after daylight and litigation had come, he apparently obtained no additional opinion on the subject. A circumstance which is conceded, and which is significant, is the fact that after the collision, and after the Ailsa had left her anchorage to seek the eastern shore, she was obliged to check her speed to permit the outward-bound steamship Advance, which was also going into Gravesend Bay, and was eastward of the Ailsa, to cross her bow. The district judge says:

"The testimony of her master is that the Advance was then upon a course south by east, which she had after passing within 300 feet of Ft. Lafayette. If this is correct, the Ailsa must have anchored to the westward of that south by east course, and hence considerably to the westward of the anchorage limits."

Another circumstance of the same character is that it appears by the Ailsa's testimony that, after she anchored, two steamships, both going down on the eastward side of her, passed very near her. A third vessel, the Bourgogne, ran into her. This shows that she was in the pathway of similarly situated vessels, who were also seeking anchorage, and that she had stopped in their way, and not outside of it. Another steamer going up on the westward side of her passed near her, from which it would seem that, although she had anchored, she was in the channel way of an upward-bound vessel, which was not seeking anchorage ground in that vicinity. After the collision, the Ailsa found that she was badly wounded, and that her hope of partial safety lay in an endeavor to reach the eastward shore promptly. The attempt was a hurried one. It was manifestly made under considerable excitement, for lives were in danger. It was impeded by the necessity of raising the anchor, and of reversing when the Advance appeared, and by the sluggish motion of a ship rapidly filling with water. The time during which she was making headway cannot be ascertained with satisfactory accuracy, but it is certain that the place where she sank was about 200 feet eastward of and within the anchorage line. Allowing that she was only six minutes in forward motion, and making all proper allowances for the impossibility of rapid move-

ment in her disabled condition, she must have moved far more than that short distance from her anchorage ground.

The Bourgogne's testimony, if approximately accurate, places the Ailsa quite to the westward of the line, and in the traveled part of the channel. The Bourgogne's pilot says that he was in mid-channel when he passed Ft. Lafayette, which would be 2,000 feet west of the fort; that he maintained a course south by east until he starboarded to go to anchor; that, shortly after, the Ailsa was seen, and a head and head collision immediately followed. The uncertain part of this account consists in the difficulty of her pilot knowing whereabouts in the channel he was when he starboarded, for the estimates of interested witnesses in regard to their position in the channel in a concededly dense fog cannot be relied upon. The testimony of the superintendent of the Ailsa in regard to the amount of water at her place of anchorage, as shown by the amount of chain which he estimates to have been in the water, is an opinion of importance in favor of her location; but all the well-ascertained circumstances point with great certainty to the conclusion that she was not only outside, but was much outside, of anchorage limits, and in the track of vessels who, like herself, were seeking anchorage. If she had been only technically in the channel, a different question would have arisen, but she was substantially within it. This conclusion fixes upon her the charge of inexcusably faulty conduct, because there was no difficulty and no serious danger in her going at least a quarter of a mile further eastward.

The next question is in regard to the negligence of the Bourgogne. In a dense fog it is the duty of a steam vessel to anchor, where anchorage is permissible, as soon as circumstances will permit, but she ought not to anchor in a thoroughfare in the very track of navigation. The Otter, L. R. 4 Adm. & Ecc. 203; The Clarita, 23 Wall. 1. The libelants confidently insist that the coming peril was perceived or ought to have been known by the pilot of the Bourgogne, and that he ought to have anchored above the Narrows, off Bay Ridge or Stapleton. It is true that he knew, when he turned the bell buoy at the end of the Mud Flats, that the vessels could not go to sea that afternoon, and that she must come to anchor; but the question for him to decide was whether to anchor forthwith, before going through the Narrows, or to go on to Gravesend Bay. At this time the fog was thick on the Staten Island side, and lighter on the Long Island side, and there was a reasonable prospect of a continuance of this state of the atmosphere until Ft. Lafayette was reached; and, immediately beyond, Gravesend Bay was a natural, wide, and favorite anchorage ground, which outgoing steamers were wont to seek in case of inability to go to sea. · Although the Ailsa preceded the Bourgogne by a little more than an hour, the conditions which each vessel met in regard to fog were about the same. Capt. Morris, of the Ailsa, first perceived the fog when his vessel was at the Narrows, and, almost immediately after passing Ft. Lafayette, ran into thick fog. Cote, her second officer, says that she ran into the fog at the beginning of the Narrows; and as she got through the Narrows, and passed Ft. Lafayette, it got very thick. Capt. Poirot, of the Bourgogne, says that, after his vessel entered

the thick fog opposite Quarantine, he wanted to anchor; but the pilot said they were too much in the Narrows, and must go south of Ft. Lafayette; and, when they were about coming to anchor, they saw the Ailsa. Giquel, her second captain, says that he saw very well at Robbins Light, but a little afterwards the weather began to get thick, and a little before Quarantine the right-hand side commenced to get thicker, and, a little before arriving at Ft. Lafayette, the weather got completely thick, and they could see nothing.

In this state of facts, a decision to go on to Gravesend Bay, or to stop, must be made before entering the Narrows, for anchorage in the Narrows was impracticable. The thickness of the fog before or as the vessel reached the Narrows was not such as to make it imprudent to go forward until the bay was reached. Her act was not in violation of a statutory rule. Therefore, its negligence or its accord with prudence must be judged of by the aid of the considerations which naturally designate conduct in this respect; and a natural inquiry is: How do men of ordinary prudence, conversant with the necessities of the situation, and with the responsibilities which attach to a decision, act under like circumstances? The Galileo was apparently the only sea-going steamer which came to anchor above the Narrows. She anchored at Liberty Island, and afterwards at Stapleton. The pilot of the Ailsa went through the Narrows, attempted to take the Gravesend anchorage, and anchored one-quarter or one-half of a mile beyond Ft. Lafayette. The pilots of at least four other steamers came to the same decision, and acted accordingly. Upon the assumption that they were men of average prudence, their concurrent action under like circumstances is very significant. The Ailsa's bell was not heard by the Bourgogne until she was seen, when all the usual precautions against collision were taken; and no fault can be charged against the moving vessel if she was not guilty of negligence in coming through the Narrows. The decrees of the district court are affirmed, with costs.