## THE JAMES D. LEARY.

### THE EVELYN.

(District Court, S. D. New York. December 14, 1900.)

ADMIRALTY—COLLISION—ANCHORAGE GROUND—NEW YORK BAY—SMOKE—FOG.
    A steamer passed the Narrows and came into New York Bay at night without a pilot, and came to anchor considerably to the east of the anchorage grounds fixed by the secretary of the treasury, which were marked by buoys; the master not knowing the true boundaries of the grounds, though the rule had been in force since 1888. A tug and tow were passing out, and the steamer was not seen by the tug until she was within 300 feet from her, when the steamer was discovered straight ahead. The tug then endeavored to avoid collision, and passed about 150 feet to the east of the steamer, which was struck by the tow. The night was clear, except for patches of fog and smoke, which obscured view of vessels but for a few minutes. The steamer's anchor light was visible at times at least from one to two miles while the tug was slowly approaching her. *Held*, that both steamer and tug were at fault for the collision; the steamer in anchoring outside the limits of the anchor grounds, and the tug in not keeping a proper lookout,—and that the damages and costs should therefore be divided.

In Admiralty.

Wing, Putnam & Burlingham and Mr. Forrester, for The Evelyn.
Foley & Wray, for the scows.
Convers & Kirlin, for The Leary.

BROWN, District Judge. The steamship Evelyn, a coastwise steamer inward bound, passed the Narrows between 12 and 1 o'clock on the morning of April 4, 1900, and anchored a short distance above the lower white spar buoy that marks the easterly line of the anchorage grounds off Clifton, Staten Island. At about 3 a. m. the tug Leary, with two loaded mud scows 110 feet long in tow on a hawser about 250 feet long, one behind the other, came out of the Kills bound for the dumping grounds below Coney Island. The tide was ebb, and according to the testimony set somewhat upon the Staten Island shore; and the Leary in going down, was headed, as her pilot testifies, from one to two points toward the Long Island shore in the direction of Fort Lafayette. The night was clear, except a little haze on the water, and the wind was light from the northwest, which carried some smoke from the copper works near Constable's Point across the bay, which was occasionally thick enough to obscure the sight of vessels to some extent and for a few minutes, when the

smoke would again clear up. On account of this smoke the witnesses from the Leary say that the Evelyn could not be seen until she was only about 300 feet away, and when the Leary was about directly ahead of her crossing her at an angle of about three points. The Leary's wheel was immediately put hard a-starboard, and going under a slow bell before, her engine was then started ahead full speed. The Leary passed about 150 feet to the eastward of the Evelyn, but the port bow of the forward scow struck the Evelyn's port bow, the hawser was parted, and the scow went down on the west side of the Evelyn, and the tug to the east. Both the scow and the steamer sustained damages, for which the above libels were filed.

Upon all the circumstances I must find the steamer, as well as the tug in fault for this collision. The weight of testimony leaves little doubt that the steamer was considerably to the eastward of the anchorage grounds prescribed by the secretary of the treasury under section 21 of the act of May 16, 1888. The easterly line marked out in those regulations as well as by the charts, runs about north by east from quarantine wharf to a point a little to the southward of the east and west line of the Kills, and embraces all the waters to the westward of that line to the Staten Island shore. The upper part of those waters is over a half a mile in breadth and gradually narrows below to a point. The easterly line of this anchorage ground is clearly marked by three white spar buoys. The clear weight of testimony is that the Evelyn was considerably to the eastward of these buoys. The pilot of the government boat Argos, a wholly disinterested witness, was engaged from half past 12 o'clock until 6 a. m. in picking up the permits of tugs going down the harbor for dumping purposes. He testifies that during this interval he passed up and down and rounded five or six times between the lower white buoy and the Evelyn, while she lay at anchor, which he says was at least 500 feet to the eastward of the buoy and about 1,000 feet to the northward and eastward of it. The pilot of the Kaiser Wilhelm der Grosse, which anchored below the Evelyn at about 2 o'clock of the same morning, confirms other testimony to the same effect. The master of the Evelyn came in without a pilot, and did not know the true easterly line of the anchorage grounds, as on cross-examination he states those grounds to run from Robbin's Reef light to Craven Shoals—an error that would explain his mistake. Considering the length of time, however, that these regulations have been in force, no vessel can be held excused for such an error. This contributed to the collision, especially in weather occasionally obscured, by throwing the tug to some extent off her guard, since vessels at anchor would not naturally be looked for to the eastward of the buoy ranges. The La Bourgogne, 30 C. C. A. 203, 86 Fed. 475, 479; The Ailsa (D. C.) 76 Fed. 868. This fault in position was enhanced by her want of an active anchor watch forward and the omission of any fog signal by ringing the bell during periods of partial obscuration and the failure to pay out chain before collision. The Richmond, 12 C. C. A. 1, 63 Fed. 1020.

The tug's testimony that there was occasional smoke from the copper works about the time of collision and some haze on the water, is confirmed by disinterested witnesses, so that I cannot discredit this

testimony altogether, although I think the tug's evidence in that regard exaggerated. The alleged sounding of fog signals was not for any considerable time. The captain says it was for about two minutes. This is not set up in the answer, nor very strongly confirmed by other witnesses. It was so brief as to be of little importance, and of the many other vessels anchored in that region at the same time, none were giving fog signals. The evidence of obscuration shows that it was only partial, occasional and for short periods; so that had a proper lookout been kept by the Leary, the Evelyn's anchor light visible at times at least from one to two miles distant while the tug was slowly approaching her, should have been seen in time to avoid collision.

Both the tug and the steamer should be held in fault and the damages and costs divided.