**O/Y FINLAYSON et al.**

v.

**THE S.S. ANTINOUS.**

**No. 2311.**

United States District Court
E. D. Louisiana,
New Orleans Division.

Oct. 31, 1957.

Montgomery, Barnett, Brown & Read, Henry J. Read, New Orleans, La., Bigham, Englar, Jones & Houston, Richard Shaw, Donald Waesche, Jr., New York City, for libellant.

Terriberry, Young, Rault & Carroll, Joseph M. Rault, Sr., Alfred M. Farrell, Jr., Phelps, Dunbar, Marks, Claverie & Sims, John W. Sims, New Orleans, La., Armbrecht, Jackson, McConnell & DeMouy, T. K. Jackson, Jr., Mobile, Ala., for claimant.

CHRISTENBERRY, Chief Judge.

At about two o'clock A.M. on April 10, 1952, a collision occurred in the Mississippi River between Shingle Point and Scarsdale Light involving the Steamship Antinous, which was owned and operated by Pan Atlantic Steamship Corporation, and the Motor Vessel Argentina, owned and operated by Det Forenede Dampskibs-Selskab, A/S.

O/Y Finlayson-Forssa A/B; Finska Sjoporsakrings Aktiebolaget; Erik Stokkebye; G. Biehl & Co.; Aktieselskabet De Danske Bomuldesspinderier; Aktieselskabet Grøn & Witzke; Forsikrings-Aktieselskabet Skanvinavia; Melbranchens Faellesindkob; Den Danske Maelkekondenseringsfabrik; Assurance-Compagniet Baltica Aktieselskab; R. Faerch A/S; Den Kjobenhavnske-Sø-Assurance-Forening Lmt.; A/S Dansk Pressefabrik; Forsikringsaktieseliskabet National; Bohlin and Lofgren; Forsakringsaktiebolaget Atlantica; Ernst Cohn & Co.; L. J. Wingqvist; Forsakringsaktiebolaget Malaren; The Continental Insurance Company; American Insurance Company of Newark; and Christiania Søforsikringsselkab, were owners, consignees, notify parties, or insurers of various shipments of cargo damaged while being carried aboard the Motor Vessel Argentina subject to the provisions of the Carriage of Goods by Sea Act of 1936, 46 U.S.C.A. § 1300 et seq., under the terms of which the carrying vessel may be relieved from liability to her own cargo for any loss of or damage thereto caused by faults or errors in the navigation of such vessel.

As a result of the collision, the said cargo interests did not attempt recovery against the carrying vessel but filed a libel directly against the Antinous seeking recovery for loss of and damage to such cargo. Pan Atlantic Steamship Corporation claimed the Antinous, answered the libel, and filed a petition of impleader against the Argentina under Rule 56 of the Admiralty Rules, 28 U.S. C. promulgated by the Supreme Court of the United States, alleging that her faulty navigation was the sole and proximate cause of libellants' loss. Det Forenede Dampskibs-Selskab A/S filed claim to the Argentina and answered the libel and petition of impleader. The answer admitted that the Argentina was solely at fault for the collision and exonerated the navigation of the Antinous in all respects.

This cause came for trial on the pleadings and evidence, the greater portion thereof being testimony of witnesses before the Court, and due deliberation having been had thereon, the Court makes the following Findings of Fact and Conclusions of Law:

## Findings of Fact

### I.

The Steamship Antinous was owned by Pan Atlantic Steamship Corporation, a corporation organized and existing under and by virtue of the laws of the State of Alabama. The Steamship Antinous was a C-2 type dry cargo vessel built in 1944, of 6065 gross tons, 449 feet in length overall, 63.1 feet in beam, with a 6,000 horsepower steam engine turning a single right-hand propeller of nineteen foot pitch. Her normal maneuvering speeds through the water under average conditions of wind and sea were: full ahead, 80 revolutions per minute, 14.2 knots; half ahead, 40 revolutions per minute, 7.1 knots; ordinary full astern, 46 revolutions per minute; emergency full astern, 86 revolutions per minute.

### II.

On April 9th and April 10th, 1952, the Antinous, en route from Miami, Florida to New Orleans, Louisiana, was ascending the Mississippi River while approximately one-third loaded and drawing 15 feet 4 inches forward and 19 feet 4 inches aft. She was fully and properly manned and equipped and seaworthy in all respects.

### III.

There was no appreciable wind. The average current in the river was no less than four knots with the current in the bends being somewhat greater.

### IV.

At approximately 1:42 A.M. on April 10, 1952, as the Antinous was proceeding upriver at full maneuvering speed near the East, or left descending, bank of the river below Scarsdale Light, which is on the same bank, and hence was on the right, or starboard side, of the Antinous, fog was observed ahead upriver. She was showing proper lights and was being navigated from the bridge by her Chief Officer, Earl Evans, who was a duly licensed Pilot for the Mississippi River. A qualified seaman was at the wheel, and Third Officer William Graham was on watch on the bridge and was handling the telegraph. A competent lookout had, earlier, been stationed on the forecastle head. Fog was seen ahead which appeared to be lighter near the East, or left descending, bank, whereupon, at 1:42 A.M., the engines were slowed to half ahead, forty propellor revolutions per minute, reducing speed through the water to no more than 7.1 knots and speed over the ground to about 3.1 knots. The Antinous commenced sounding regular fog signals at least every minute. The Master, Samuel Wonson, was called from the chartroom and came on the bridge.

### V.

Upon first entering the fog, the Pilot and the Master of the Antinous conferred as to the advisability of anchoring. The vessel then being in one of the deeper and swifter parts of the river, the Master and Pilot reasoned that it would be unsafe to anchor there in fog where other vessels might be encountered, and concluded with justification that the only safe procedure under the circumstances was to continue upriver a short distance while remaining in sight of and near the East bank and to anchor under Shingle Point, where the chart showed there to be a sheltered, and otherwise reasonably safe anchorage. The Antinous was not equipped with radar and Pilot Evans rightly felt that it would be imprudent to leave the East bank or to seek an anchorage on the West bank, since by doing so the Antinous would leave a known position and be exposed to the hazards of unknown traffic in midstream.

### VI.

When in the vicinity of Scarsdale Light, the Antinous exchanged a series of fog signals with an unidentified vessel which was eventually observed to pass well clear to the port side of the Antinous, between her and the West bank of the river.

### VII.

A short time later, Second Officer John H. Stone, Jr., who, though off duty, had heard the fog signals of his ship, reported to the bridge and was ordered to the forecastle head to stand by the anchors.

## VIII.

At 1:58 A.M., Antinous time, when the Antinous was approximately one-half mile above Scarsdale Light, parallel to and within 150 or 200 feet of the East bank and still proceeding with her engines half ahead, making 3.1 knots or less over the ground, her navigators and lookout heard a two-blast signal off the port bow at an unascertainable distance from an unseen vessel which eventually proved to be the Motor Vessel Argentina. Being without radar, and no one on board having heard any whistle signals forward prior to this two blast signal, the Antinous had had no reason until then to suspect the Argentina's presence.

## IX.

Pilot Evans, immediately upon hearing the two-blast signal, ordered the engine stopped and simultaneously sounded four short blasts on the ship's whistle. Third Officer Graham promptly relayed the engine order to the engine room by means of the engine order telegraph. Second Assistant Engineer Joseph Simon, Jr., on duty in the engine room, received the order and immediately stopped the Antinous' engines. The Antinous' heading was parallel to the East bank.

## X.

About a minute later, the Antinous' navigators heard what they interpreted to be a danger signal followed by a second two-blast signal from the unseen Argentina. Thereupon, the Antinous' Pilot ordered the engines reversed full and sounded another danger signal, followed by a three-blast signal. Her Master ordered Graham to give the telegraph a "jingle", which was done, and the Second Assistant Engineer engaged the throttle emergency full astern.

## XI.

The mast lights of the Argentina were seen for the first time at a distance variously estimated to be between one and three ship's lengths and bearing approximately one and one-half points off the Antinous' port bow. The Argentina's range was open and showed her to be headed diagonally across the Antinous' bow on a course that would have brought her bow into contact with the river bank but for the ensuing collision.

## XII.

In the meantime, the Second Officer, en route to the forecastle head, heard the Antinous' backing signal as he crossed the foredeck. He continued forward over obstructions on deck, expended approximately thirty seconds insuring that the brakeband and anchors were clear for letting go, ordered the lookout off the bow, and then looked up and observed the Argentina between 150 and 225 feet distant.

## XIII.

The Chief Engineer, Marcine Langley, heard the Antinous' first danger signal while in his stateroom which was located on the forward port corner of the midship house. He looked out of his porthole, heard whistles from a ship which he could not see, put on his slippers, and descended two decks to the engine room. Upon arrival there, he observed that the tachometer indicated that the propeller was turning 83 revolutions astern. He was in the engine room long enough to relieve the Second Assistant Engineer, send him to the fire room, and then open the throttle "a couple of more turns" prior to feeling the impact of the collision and observing that it occurred shortly after 0200, according to the engine room clock.

## XIV.

Prior to the collision, the Antinous' engines reached 86 revolutions per minute astern. Her headway through the water had stopped and she had commenced going astern slowly as her stern swung to port and her propeller wash reached a point forward of the midship's house and bridge.

## XV.

The Motor Vessel Argentina was owned by Det Forenede Dampskibs-Selskab, A/S, a corporation existing under and by virtue of the laws of Denmark. Constructed in 1943, she was of 4,629 gross tons, 350 feet in length overall, 50½ feet

in beam, with a 3,200 horsepower diesel engine turning a single righthand propeller with nine foot pitch. Her normal speeds through the water were: full ahead, 160 revolutions per minute, 13.5 knots; half ahead, 110–115 revolutions per minute, 9.5 knots; slow ahead, 45–50 revolutions per minute, 4.5 knots; ordinary full astern, 167–172 revolutions per minute; and emergency full astern, 175 revolutions per minute. The vessel was radar equipped.

### XVI.

At about 1:00 A.M. on April 10, 1952, the Motor Vessel Argentina, drawing 24 feet 6 inches forward and 22 feet 5 inches aft, got underway from Chalmette, Louisiana, and began descending the Mississippi River. A Crescent River Port Pilot was aboard and directing her navigation. Thereafter, intermittent fog limited visibility.

### XVII.

Her radar was in operation and, apparently, was in good working condition. However, it was observed only intermittently by the Pilot, who, with her officers, did not properly interpret, or correctly appraise the information which it provided.

### XVIII.

Conditions of fog and visibility varied as the Argentina proceeded and her speed also varied. Fog signals were sounded intermittently but there was no regular system or time pattern employed and there is no evidence that signals were sounded at least once every minute.

### XIX.

Assisted by the minimum current of four knots, her speeds over the ground were no less than the following: at full ahead, 17.5 knots; half ahead, 13.5 knots; slow ahead, 8.5 knots.

### XX.

At about 0152 Argentina time, or twelve minutes before collision, there was seen on the radar a vessel, which later proved to be the Antinous, near the East bank of the river. According to the radar, the range was almost three miles and the bearing was practically dead ahead or slightly off the Argentina's starboard bow. The Argentina was then proceeding at full speed ahead, having rounded English Turn Bend to her right of the center of the river, and was shaping to a course of 180 degrees but was still swinging gradually to the left from an earlier heading of 200 degrees toward 190 degrees.

### XXI.

By 0154 the Argentina was steady on a course of 180 degrees to bring her diagonally toward the East bank. She was in heavy fog and speed was reduced from full to half ahead or about 13.5 knots over the bottom. Neither bank was visible to the eye. On the Argentina's radar it was seen that the Antinous, whose bearing had originally been practically dead ahead, now bore two points off the starboard bow. Misinterpreting the radar information, the Argentina's navigators incorrectly assumed the change in bearing to mean that the vessels would pass starboard to starboard when actually there had been no course alteration by the Antinous and her change in radar bearing merely reflected the gradual swing of the Argentina to 180 degrees. Possibly contributing to misinterpretation of the radar observation was the presence of two other vessels, The Anita and the tug Rode Zee, which were near the West bank.

### XXII.

At 0157, because of increasingly impaired visibility, the Argentina's speed was further reduced to slow ahead, or some 8.5 knots over the bottom. Thereafter, although a fog signal was heard ahead on the starboard bow, the Argentina did not stop, but instead at 0159½ her speed was increased to half ahead on the mistaken assumption that the position of the unseen Antinous from whom the fog signals were heard, had been correctly ascertained by the radar observations. Shortly after the said fog signal was heard forward, the masthead lights of the Antinous were sighted, bearing twenty or twenty-five degrees

on the starboard bow. The sidelights were obscured by fog.

## XXIII.

No fog signals were sounded by the Argentina subsequent to 0159½, Argentina time, and there is no evidence to establish when the Argentina last sounded a fog signal.

## XXIV.

Although no sidelights of the Antinous could be seen, a two-blast passing signal was sounded by the Argentina shortly after the sighting, proposing to the Antinous that the two vessels pass starboard to starboard. This signal was not audible on the Antinous, possibly because of her own fog signals, and no reply was received by the Argentina. Notwithstanding failure to obtain an agreement, and erroneously assuming that she was visible to the Antinous, the Argentina's Pilot ordered "easy port" and the Argentina began swinging to her left increasing the angle to the East bank and across the course of the Antinous. No further rudder orders were given prior to the collision.

## XXV.

Shortly before 0202, Argentina time, a second two-blast signal was sounded. At this time the Argentina had reached a position near the East bank of the river, still swinging left from 180 degrees. This was the signal heard by the Antinous at 0158, Antinous time, and to which she immediately replied by sounding the danger signal and simultaneously stopped her engines.

## XXVI.

After hearing the Antinous' danger signal, the Argentina went astern sounded the danger signal, and followed with a backing signal. This was the second signal from the Argentina heard by the Antinous and, interpreted to be a danger signal followed by a two-blast signal, was answered by a danger signal and a three-blast signal as the Antinous reversed her engines emergency full.

## XXVII.

The heavily laden Argentina could not, and did not, stop her forward progress prior to the collision which occurred at 0204 Argentina time and shortly after 0200 Antinous time. At the moment of impact, her forward speed was at least three or four knots through the water and six or seven knots over the ground and her heading was less than 180 degrees true, probably about 160 or 170 degrees true. She would have struck the bank had she not struck the Antinous.

## XXVIII.

Under the sweeping effect of the current and momentum, the starboard side of the Argentina, in the vicinity of #2 hatch, came into contact with the prow of the Antinous, as that vessel backed away through the water, at an angle of approximately 60 to 70 degrees (measuring clockwise from the center line of the Argentina to the projected heading of the Antinous), damaging both vessels and the Argentina's cargo.

## XXIX.

The range of visibility just before collision is not precisely ascertainable but was no less than two ships' lengths.

## XXX.

The collision occurred at a point about one-half mile above Scarsdale Light, less than one-half ship's length from the East bank of the river.

### Conclusions of Law

#### I.

██ The subject matter of this litigation, a marine collision, is within the admiralty and maritime jurisdiction of the Court. 28 U.S.C. § 1333.

#### II.

██ The collision occurred in an area controlled by the Inland Rules, 33 U.S.C. A. § 151 et seq.

#### III.

The Motor Vessel Argentina was solely at fault for this collision.

## IV.

■ The collision and resulting losses were caused solely and proximately by a combination of the following faults of the Motor Vessel Argentina and those in charge of her navigation:

A. She failed to make proper use of her radar equipment. Polarus Steamship Co., Inc., v. The T/S Sandefjord, 2 Cir., 1956, 236 F.2d 270, 1956 A.M.C. 1779, certiorari denied 1957, Viriks Rederi A/S v. Polarus S.S. Co., 352 U.S. 982, 77 S.Ct. 383, 1 L.Ed.2d 365; United States v. The Australia Star (The Hindoo, The Australia Star), 2 Cir., 1949, 172 F.2d 472, 1949 A.M.C. 423; and The Medford (Barry-Medford), D.C.E.D.N.Y.1946, 65 F. Supp. 622, 1946 A.M.C. 795. Radar is not a substitute for moderate speed nor does it serve as an excuse for non-compliance with the Rules. Undue reliance upon radar by the Argentina is illustrated by her continued high speed, misinterpretation of the information it made available, and the initiation of a proposed passing which would not have been attempted in clear visibility or by a vessel not operating with radar.

■ B. Her speed was grossly immoderate. Inland Rules, Article 16 (33 U.S.C.A. § 192).

C. She failed to stop her engines and to proceed with caution upon hearing a fog signal forward of her beam from the Steamship Antinous. Inland Rules, Article 16 (33 U.S.C.A. § 192); Lie v. San Francisco and Portland S.S. Co., 1917, 243 U.S. 291, 37 S.Ct. 270, 61 L.Ed. 726.

D. She failed to sound fog signals at intervals of not more than one minute. Inland Rules, Article 15 (33 U.S.C.A. § 191).

E. She proposed a starboard to starboard passage in violation of Article 18 of the Inland Rules when only the masthead and range lights of the Antinous were visible to her and the vessels were not in sight within the meaning of the Rule. 33 U.S.C.A. § 203.

F. She proposed and persisted in an attempt to execute a starboard to star-board passage, despite the fact that no assent to such proposal was received from the Antinous. Inland Rules, Article 18 (33 U.S.C.A. § 203); The City of Tokio, 2 Cir., 1935, 77 F.2d 315 and cases cited therein; and The John D. Rockefeller, 4 Cir., 1921, 272 F. 67. See also, Bisso Towboat Co. v. United States, 5 Cir., 1925, 6 F.2d 132.

## V.

■ The Steamship Antinous complied fully with her obligations under the applicable laws and as set forth in the Inland Rules, 33 U.S.C.A. § 151 et seq., and navigated in accordance therewith.

■ A. She was not obligated by law to anchor, either before or after entering the fog. In that area of the river she was traversing prior to and at the time of entering fog, and in that area she was navigating after entering fog, river and traffic conditions rendered anchorage unsafe. Even more hazardous would it have been for her to cross from her known position on the East bank to the West bank through the center of the river where heavy traffic was to be expected. There is no designated anchorage on the West bank and as the fog was more dense on the West side of the river, the Antinous would have exposed herself and other vessels to greater danger. There were actually two other vessels already in the West bank area and in addition to the Argentina, there was still another vessel, the Steel Chemist, downbound in the river. It was a proper and correct exercise of her navigators' discretion and skill to decide to continue up the East bank to the sheltered anchorage under Shingle Point. She could proceed to that anchorage in full compliance with the requirements of the Inland Rules. The Mohegan (Lakewood-Mohegan), 2 Cir., 1928, 28 F.2d 795, 1928 A.M.C. 1759, 1760; The Ailsa (The La Bourgogne), D.C.S.D.N.Y.1896, 76 F. 868, affirmed, 2 Cir., 1898, 86 F. 475; and The Benjamin A. Van Brunt, 1 Cir., 1899, 98 F. 131.

■ B. The Steamship Antinous was operated at a moderate speed and under

proper control. The Umbria, 1897, 166 U.S. 404, 17 S.Ct. 610, 41 L.Ed. 1053; Polarus Steamship Co., Inc., v. The T/S Sandefjord, D.C.S.D.1955, 1956 A.M.C. 1000, affirmed 2 Cir., 1956, 236 F.2d 270, 1956 A.M.C. 1779, certiorari denied Viriks Rederi A/S v. Polarus S.S. Co., 1957, 352 U.S. 982, 77 S.Ct. 383, 1 L.Ed.2d 365; Gertrude Parker, Inc., v. Abrams, 1 Cir., 1949, 178 F.2d 259, 1950 A.M.C. 29; The Diamond (Diamond-Indiana), 9 Cir., 1926, 14 F.2d 923, 1926 A.M.C. 1696; The Ailsa (The La Bourgogne), D.C.S.D. N.Y.1896, 76 F. 868, affirmed 2 Cir., 1898, 86 F. 475; and, The Benjamin A. Van Brunt, 1 Cir., 1899, 98 F. 131.

C. The Steamship Antinous was sounding fog signals as required by the applicable laws, rules and regulations. Inland Rules, Article 15 (33 U.S.C.A. § 191).

D. The Steamship Antinous responded properly to all signals she heard or should have heard from the Argentina.

E. The Steamship Antinous' lookout was efficient. He heard and saw all that could be reasonably expected of him and reported all of his observations.

F. The Steamship Antinous acted prudently in rejecting the improper two-blast proposal of the Motor Vessel Argentina, while stopping her engines and sounding a danger signal. Inland Rules, Article 18 (33 U.S.C.A. § 203).

## VI.

The admitted faults of the Motor Vessel Argentina are clear. Entirely apart from any admissions, the record proves faults so flagrant, gross, and inexcusable, on the part of the Argentina, that the Court must conclude that they were the only cause of the collision. There is no basis for the charges of fault made against the Steamship Antinous.

## VII.

Libellants are not entitled to recovery from their own carrier, the Argentina, because of the provisions of the Carriage of Goods by Sea Act, 46 U.S.C.A. § 1300 et seq., relieving the carrier from liability for damage to and loss of cargo occasioned by faults or errors in the navigation of the carrying vessel.

## VIII.

Libellants are not entitled to recover any damages or sums from the Steamship Antinous or from her owners, Pan Atlantic Steamship Corporation.

Accordingly, a final decree has been entered dismissing the original libel as against the Steamship Antinous, and her owners, and also dismissing the petition of impleader by such owners against the Motor Vessel Argentina.