THE PATIENCE.

MORSE & ROGERS et al. v. PHILADELPHIA & R. RY. CO.

(District Court, E. D. New York. August 5, 1908.)

1. COLLISION (§ 85*)—OVERTAKING STEAMER AND TOW—FOG.

A collision which occurred at night in a fog southeast of the Pollock Rip Shoals lightship off the coast of Massachusetts between the last of three tows and an overtaking steamer which ran into the towline after passing the tow *held* due solely to the fault of the steamer either in fail-

ing to locate the tow or in failing to keep away, it appearing that the tows all carried proper lights and that the steamer's lights were seen from the second and third tows before the collision.

[Ed. Note.—For other cases, see Collision, Cent. Dig. § 169; Dec. Dig. § 85.*

Overtaking vessels, see note to The Rebecca, 60 C. C. A. 254.]

**2. COLLISION (§ 61*)—NAVIGATING WITH LONG TOW.**

The fact that a tug with tows at sea was navigating at night with unnecessarily long towing hawsers does not render her in fault for a collision, unless the length of the tow caused or was a factor in causing it.

[Ed. Note.—For other cases, see Collision, Cent. Dig. § 78; Dec. Dig. § 61.*]

**3. COLLISION (§ 82*)—NAVIGATING IN FOG—SPEED.**

A speed of from four to six knots on the part of a tug with tows navigating at sea at night in a fog is not ordinarily negligent.

[Ed. Note.—For other cases, see Collision, Dec. Dig. § 82.*

Collision rules-speed of steamers in fog, see note to The Niagara, 28 C. C. A. 532.]

In Admiralty.

Wing, Putnam & Burlingham (Henry E. Mattison, of counsel), for Joy S. S. Co.

Carpenter, Park & Symmers (Samuel Park and James K. Symmers, of counsel), for Walter J. Tice.

Wallace, Butler & Brown (Fredk. M. Brown and Howard S. Harrington, of counsel), for cargo owners.

Lord, Day & Lord (Charles J. Fay, of counsel), for claimants Kendall and Bridges.

Armstrong, Brown & Boland (Pierre M. Brown, of counsel), for Philadelphia & R. Ry. Co.

CHATFIELD, District Judge. The present case is based upon a petition filed by the owner of an ocean-going steam tug, the Patience, asking for a limitation of the liability of the tug, in order to contest that liability for damages, loss, etc., arising from a collision which occurred on the 7th of May, 1905, at a few minutes after half past 1 in the morning, in the waters to the south and east of the Pollock Rip Shoals lightship, which is stationed about four miles off the coast of Massachusetts, southeast of Cape Cod, and north of the shallow waters between Nantucket Sound and the Atlantic Ocean. As shown by the government chart put in evidence, a passage called the "Pollock Rip Slue" extends in a direction approximately southwest by south from a point about two miles southwest of the lightship, and to the south of this Pollock Rip Slue is located the Pollock Rip lightship. The slue is some two miles in length, and is comparatively narrow, while near the Pollock Rip lightship the channel makes its way by several turns between shoals of extremely shallow water.

Upon the night in question the Patience, a seagoing tug about 125 feet in length, had left Boston for New York, having in tow three barges, none of which at the time was loaded, and which were, named in the order in which they were towed, the Franklin, the Indian Ridge,

and the Glendower. The testimony shows that the hawsers between the tug and the Franklin, and between the Franklin and the Indian Ridge, were about 150 fathoms in length. The hawser between the Indian Ridge and the Glendower was perhaps a little shorter, but approximately the same, at any rate over 125 fathoms. Early in the evening, or around half past 8, when the Patience and her tow were not far from Cape Cod, a heavy fog set in, and instructions were given to the engineer of the tug to reduce the steam pressure to 135 pounds, and the tow proceeded thus to a point off Chatham, Mass., and some four or five miles from the Pollock Rip Shoals lightship. At this point the speed of the ship was slowed to one bell, and the statement of the captain to the United States local inspectors, made three days after the accident, as well as the testimony of the engineer and of the captain on the trial, would indicate that the Patience, with the tow, the barges being light, was proceeding at a rate through the water of from four to five knots, the tide was ebb, setting in the direction in which the towing was proceeding, and running with the strength of from one to one and a half knots. The Patience was sounding ordinary steam fog whistles, of one long and two short blasts, at intervals of about two minutes, and reached a point about half a mile to the eastward of the Pollock Rip Shoals lightship at 1:30 a. m. Before reaching the lightship the whistles of one or two steamers and of another tow were heard, but these vessels passed by, on one side or the other, some time before the lightship was reached. The testimony of the witnesses shows satisfactorily that these boats all went out of hearing, and there is nothing to connect them with subsequent events. Each of the two forward barges in the tow had two white stern lights, as well as the red and green side lights, and the captain of the Glendower, for a short time previous to half past 1, was giving fog signals from an automatic horn on the bow of his vessel. The Glendower had one white stern light and red and green side lights. The steamer Aransas, of the Joy Steamship Line, left Boston the same evening for New York, and proceeded at full speed until she ran into the same fog, at about 8:30 p. m. The Aransas reached Cape Cod about 10:30, changed her course to south-southeast, then to south by west, and between half past 12 and 1 o'clock reached a point opposite Chatham lightship.

In the statement made to the inspectors three days after the collision, the captain fixes the time of passing Chatham at 12:55, while upon the trial he fixed it at 12:30 a. m. The testimony of the other witnesses would seem to indicate that the Aransas reached a point opposite Chatham in the neighborhood of 12:50 or 12:55 a. m. At this point her engines were stopped, and she then ran under one bell to a point off the Pollock Rip Shoals lightship, where, having located the whistle on the lightship, her course was changed to south-southwest toward the Pollock Rip Slue.

The witnesses from the Aransas testified to the hearing of various signals from passing vessels during the fog, which apparently did not decrease in density, but these vessels had all passed, and no further signal was heard until just before passing up Pollock Rip Shoals light-

ship, when several of the witnesses on the Aransas testify that they heard the signal of the Glendower, blowing one long and two short. This signal ceased about 10 minutes before the accider

It will be remembered that the Glendower was some 2,700 feet from the Patience, and the captain of the Glendower testifies that he heard the whistles of the Aransas coming on an approximately parallel course, that he blew his whistles until the Aransas had reached a point forward of his beam, and then, considering that she had passed by, he went back toward the stern of his vessel, and to the cabin to see the compass.

The witnesses upon the Aransas do not seem to have located the fog signals of the Patience, and if they heard them no particular attention was paid to them; but the signals of which notice was being taken were apparently those blown by the captain of the Glendower. None of the witnesses on board the Patience heard the signals on board the Aransas, and it was impossible for the Patience to see through the fog the lights of any of the barges beyond that nearest to the Patience herself. This places the distance at which a light could be seen at about 900 feet, and the captains of the various barges testify that they could see the barges next to them, but no others.

The testimony of the witnesses on the Aransas is to the effect that they steadily held their course, after the fog signals which had been heard from the Glendower ceased, that suddenly white stern lights were seen ahead, followed almost immediately by a red light a few points off the starboard bow, and a green light also to starboard, followed in a few moments by a blow amidships on the starboard side of the Aransas, from which she sank in about 15 minutes.

The testimony of the witnesses is unanimous as to the place in which the Aransas was struck, and that the bow of the Glendower crushed in the bulkhead and upper works of the Aransas to such an extent that she proceeded to fill immediately. All the passengers were saved, with the exception of one woman, who disappeared, although fitted with a life-preserver and assisted toward one of the boats.

The testimony of the captain of the Glendower is that his hawser was partially submerged, and that the Glendower was following directly in the wake of the other barges, which were following in a straight line the course of the Patience; that there was no veering or change of course, and that the stem of the Aransas struck the hawser some 300 or 400 feet from the bow of the Glendower. The captain of the Glendower rushed to the bow of his vessel, cut the hawser with an ax, and before any change of course could be made the vessels came together in the manner aforesaid. The helmsman of the Glendower felt the swerve and strain on his hawser, which he says was jerked violently to starboard. The Glendower started ahead rapidly, he met the swerve with his helm, and then the hawser parted, and in a short time the collision occurred.

There is some testimony by the mate of the Aransas that just prior to the collision an order was given to port the helm of the Aransas, but there is nothing to indicate the degree or rate at which the Aransas responded to the helm. There is a conflict of testimony as to whether

the Aransas, under this ported helm, had steerageway or was backing, inasmuch as, just before the signal to port was given, the engines were directed to be reversed. If the Aransas had been going astern at the time of porting the helm, the testimony is that the bow would be thrown to port, and inasmuch as she continued across the bow of the Glendower, and apparently to starboard, it seems to be apparent that the reversing of her engines had not yet stopped her headway, and that the throwing of her helm to port brought the steamer further across the Glendower's bow. The efforts of the Glendower's steersman to overcome the effect of the blow on the hawser also continued, in all probability, and threw the head of the Glendower to port.

The witnesses from the Aransas testify to having seen the white stern lights of the barge ahead, and there is but one conclusion to be drawn from the situation (inasmuch as there is no evidence to indicate any attempt on the part of the tow to circle out to sea for an anchorage), and that conclusion is that, when the captain of the Glendower ceased blowing his fog horn, the Aransas, which was following a course on the outside, apparently converging slightly with that of the tow, ran alongside of the Glendower, and struck the hawser before realizing her whereabouts. It may be that, seeing the stern lights of the Indian Ridge, with the knowledge that a tow was in the immediate neighborhood, the Aransas proceeded to port her helm and reverse her engines to keep out of the way. The same action would have resulted if the Aransas, or any person in the pilot house of the Aransas, suddenly saw the red light of the Glendower and the stern light of the Indian Ridge, a signal to reverse and to port being the natural one under the circumstances. But negligence cannot be imputed either to the captain of the Aransas nor to the captain of the Glendower for what happened at this point. The vessels were in extremis then. And still less can any negligence for the action taken at this point be imputed to the captain of the Patience, who knew nothing of the matter until signaled by the Glendower that the barge was adrift.

It is apparent from the cases and the International Rules that the Glendower was not compelled to give fog signals. International Rule 15 provides that a vessel in tow may sound fog signals, and, in the light of the collision, it would perhaps have prevented the accident if the captain of the Glendower had continued to sound his signals after he had assumed that the Aransas was forward of his beam. But it seems impossible to assume negligence on his part in considering that signals were necessary only to the point where the boat passing seemed to have gone clear, and there seems to have been no duty or no rule which would require the captains of the other barges to give fog signals under the circumstances. The Patience seems to have performed her duty in every respect, unless with respect to the question of speed, which will be considered later.

The evidence shows that the captain of the Patience intended to consider anchoring at some point to the west of the channel and south of where the collision occurred. Much testimony was devoted to inquiring whether he could have anchored north of this spot. But it is dif-

ficult to see what negligence there can be in proceeding as he did, and it is academic to question whether he intended to anchor, or intended to run the slue with or without shortening his hawsers. What might have been done after leaving the place where the accident occurred would not have prevented the accident. The testimony would indicate that he was proceeding as he would if not intending to anchor at all, and, if the Patience is to be held responsible, it must be for going ahead, and not for debating the possibility of anchoring.

There is no evidence on which to base the suggestion that the Patience was struggling out into the open sea, as if to hunt for an anchorage, except the opinion of the captain of the Aransas as to the course upon which the tow was proceeding, and all of the testimony seems to indicate that he was mistaken on this point. Nor does the question of the length of the tow seem to enter into the matter. If the tow had been shorter, the signals of the Patience and the signals of the Aransas might more easily have been heard by each other. If the hawser to the Glendower had been longer, the boats might have cleared. But the length of the tow only puts upon the towboat the responsibility of greater caution, and the cases cited (The Gladiator, 79 Fed. 445, 25 C. C. A. 32, The Harold [D. C.] 84 Fed. 698, and The Whitney [D. C.] 77 Fed. 1001, affirmed 86 Fed. 697, 30 C. C. A. 343) while criticising long tows in such waters and in this very locality, do not attempt to make the use of long towing hawsers negligence, unless the length of the tow enters into the happening of the accident. Here the length of the tow, or the number of boats ahead of the Indian Ridge in the tow, had nothing to do with the matter.

An attempt has been made to argue that the Patience was negligent in that she was proceeding at too great a rate of speed, and thus made it impossible to avoid accident if the tow or any one of the barges struck another vessel. On this theory, the only way to be entirely free of negligence would have been not to have been in the place, or to have been at anchor; and again the rate of speed, provided the speed was not excessive, would have no bearing upon the question of negligence, unless that rate of speed entered directly into the cause of the accident.

It can hardly be argued that the captain of the Patience should have contemplated that if a vessel struck the hawser between two of the barges, or in some way placed itself in front of one of the vessels of the tow, he would be chargeable with negligence, unless going so slow that the impact of the vessels would not injure one another. As has been said before, the only absolutely safe method of procedure in this manner would be to stand still, and a speed of from four to six knots in the open waters at the point in question would not seem to be ordinarily negligent, even in a fog, if the other ordinary precautions were properly taken. As to the speed of the Aransas, in the same way, it can hardly be considered negligent to have proceeded to the Pollock Rip Shoals lightship at the rate at which she was going. She certainly slowed up just before the accident, and, to have prevented the overtaking, would have had to be going slower than the tow. This was unnecessary, unless the mere fact of passing, without other negligence, was the cause of the collision.

Whether the Aransas was negligent in attempting to pass the tow without slackening speed, and whether her officers used proper care **and judgment in locating by** hearing and by sight the fog signals and lights of the tow, presents the only difficulty in the case. It is apparent that some confusion existed at the moment when the captain, pilot, and helmsman of the Aransas discovered the white lights of the Indian Ridge and the red lights of the Glendower, and at that time the vessels must have been almost in a straight line from the Patience, through the Franklin, Indian Ridge, Aransas, and Glendower. The courses of the tow and of the Aransas approximately parallel, but with the Aransas on the port or outside, must have brought the Aransas, at the time she had passed the Glendower and thus lost sight of the Glendower's stern lights, very close to the line of the tow. That this is so can be seen from the testimony of Crocker, who testifies (page 258) that he was at the port window of the pilot house, and saw the white stern light of the barge ahead, at the same time that the captain saw the red light of the Glendower, the captain being "on the starboard side." Crocker testifies that at that time the engines had been stopped, and the set of the ebb tide apparently had the effect of bringing the vessels closer together. It is also testified that the Aransas had been slowed up to take soundings; but, if so, there is all the more reason for considering that speed did not cause the collision, and all the more reason for holding the officers of the Aransas, the overtaking vessel, negligent in not locating the tow. According to Crocker's testimony, the signal to start the engines astern and to port the helm was given as soon as the lights were seen, and it is the opinion of those upon the Aransas that the bow of the Aransas moved to port and not to starboard; but in view of the fact that the captain of the Aransas in his diagram, placed in evidence, makes the Glendower strike the Aransas approximately as follows:

—it would seem that the movement of the Aransas under its helm must have been sharply to starboard, and just afterward the collision occurred. If this assumption be correct, the only mistake was in assuming that the engines could be reversed and the Aransas started back in time to avoid collision. An error of judgment under those circumstances could hardly be deemed negligence, and it is extremely doubtful if the collision could then have been avoided, although the effect might have been different if the blow had been imparted in a different direction.

The captain of the Indian Ridge testified that the Aransas changed her course after passing the Glendower, that he could see the masthead lights of the Aransas plainly, and saw them swing out of line (the forward of these lights on the lower masthead moving to starboard), that the Aransas passed the Glendower 300 feet away, and that the Aransas came on at full speed. If this be true, the Aransas should have seen the lights of the tow as well as heard the whistle of the Patience, and, being the overtaking vessel, was plainly to blame.

It may be that the accident occurred in the following way: The tow would take some 5 minutes to go half a mile, and the testimony is that the vessels sank about half a mile southeast of the lightship. The Patience had been running on a course to the lightship approximately south by west. The accident occurred within 10 minutes after locating the lightship and changing the course to southwest by south. The Aransas also changed her course from south by west to south-southwest when opposite the lightship. If the tow had not proceeded a full mile, and if the Glendower had not completely gained the new course, the Aransas (especially if she changed her course a little to the north of the spot where the tow was changing) would have been on a line rapidly converging with the path of the Glendower when the vessels came alongside. Under such circumstances the Aransas could have crossed the line of the Glendower, without a change of course. But how can it be considered that the Aransas was not negligent in failing to locate the tow in time to keep out of the way, or in not keeping out of the way when she plainly knew she was overtaking the tow?

The Aransas has charged negligence on the part of the Patience and the Glendower, the Glendower has charged negligence on the part of the Aransas, the Patience has charged negligence on the part of the Aransas, and the owners of the cargo of the Aransas have charged negligence on the part of all three, although as to the Aransas the question of the proceedings to adjudicate and limit the liability of the Aransas, in which the owners allowed the matter to go by default, is set up as a bar to this charge of fault against the Aransas. The proceeds from the sale of the Aransas not being sufficient to cover costs, that proceeding was allowed to go by default. If the liability of the Aransas were the one question herein, the matter might be considered res adjudicata; but in view of the result of the former proceeding, the issues in that proceeding to limit the liability of the Aransas were clearly immaterial, so far as determining which vessel was in fault. The Aransas herself has charged negligence and opened the issue in that respect, and the plea of res adjudicata cannot be taken advantage of as against the vessels concerned. Inasmuch, however, as it seems to this court that none of the vessels other than the Aransas can be said to have been in fault, and as the proceeds of the Aransas have been exhausted, all of these questions become of no consequence in this proceeding.

The various petitions should be dismissed, with the exception of the application of Walter J. Tice, owner of the Patience, for a limitation of the liability of that vessel, in which proceeding judgment relieving the owner of liability should be granted.