## THE PERSIAN.

## THE HESPERIDES.

### (Circuit Court of Appeals, Second Circuit.   August 11, 1910.)

### Nos. 266, 267.

1. COLLISION (§ 80*)—NAVIGATION IN FOG—ANCHORING IN FAIRWAY.

When dense fog obscures a waterway through which there is a well-defined track for moving vessels, prudence requires vessels then moving therein to continue with extreme caution, availing of such sights and sounds as they can make out till they reach some anchorage to which they can withdraw from the regular track, leaving the thoroughfare unobstructed by their presence.

[Ed. Note.—For other cases, see Collision, Cent. Dig. §§ 152–155; Dec. Dig. § 80.*]

2. COLLISION (§ 83*)—MOVING AND ANCHORED STEAMSHIPS—FOG.

A collision occurred at night in a dense fog off the Massachusetts coast a short distance to the north of the northern entrance to Pollock Rip Slue between the steamship Persian going northward and the steamship Hesperides, which had anchored on account of the fog. The fairway for deep-draft vessels navigating up and down this part of the coast lies for miles through dangerous shoals and has been charted and marked by the government by lightships and buoys. From the Pollock Rip Shoals Lightship, which was a half mile or more to the northward of the place of collision, the range is straight to the southward through the slue for 4½ miles to the Pollock Rip Lightship, marked at intervals of 1½ miles by Whistling Buoy No. 2 and Bell Buoy No. 1, and the preponderance of evidence showed that the Hesperides was anchored directly in this range, which vessels in a fog follow by compass between the two lightships. The Persian stopped on hearing the fog bell of the Hesperides, but on seeing a light on the starboard bow the master assumed that it was on a small vessel, starboarded the helm, and proceeded at greater speed directly toward the Hesperides, whose stern light was then seen on the port bow, but too late to avoid collision. Held, that the Hesperides was in fault for anchoring in the dense fog in the fairway, which was constantly used by other vessels when there was open sea to the east of her; that the Persian was also in fault for not navigating with greater caution after hearing the fog bell of the other vessel.

[Ed. Note.—For other cases, see Collision, Cent. Dig. §§ 156, 167, 175; Dec. Dig. § 83.*]

Appeal from the District Court of the United States for the Southern District of New York.

Suits in admiralty by the British & South American Steam Navigation Company, Limited, as owner of the steamship Hesperides, against the steamship Persian, and by the Miners' & Merchants' Transportation Company, as owner of the steamship Persian, against the steamship Hesperides. Cross-suits for collision. Decrees in favor of the Hesperides (159 Fed. 788), and the owner of the Persian appeals. Reversed.

This cause comes here upon appeal from decrees of the District Court, Southern District of New York, holding the steamship Persian solely in fault for a collision with the steamer Hesperides, which took place in a dense fog, on the night of June 29, 1907, near the northern entrance of Pollock Rip Slue, off Monomoy Island, on the coast of

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep't Indexes

Massachusetts. Both vessels were damaged, and cross-libels were filed. The opinion of the district judge will be found in 159 Fed. 788.

Wheeler, Cortis & Haight and Daniel H. Hayne, for appellant.
Convers and Kirlin, for appellee.

Before LACOMBE, COXE, and NOYES, Circuit Judges.

LACOMBE, Circuit Judge. The general facts are succinctly stated in the following excerpts from the opinion of the district judge, it being premised that at Pollock Rip Lightship the course of vessels bound up or down the coast makes an abrupt turn of about 90°:

"At the southern entrance to Pollock Rip Slue is stationed the Pollock Rip Light Vessel. From this light vessel to the northward at intervals of about a mile and a half apart are stationed first Bell Buoy No. 1, the Whistling Buoy No. 2, and then the Pollock Rip Shoals Light Vessel. There are shoals on each side of the line between the Pollock Rip Light Vessel and the Bell Buoy No. 1; on the course of the Pollock Rip Shoals Lightship, there are no shoals to the eastward. All the region to the eastward is open ocean. The Hesperides that night was bound from Boston to New York. Shortly after passing Pollock Rip Shoals Light Vessel the fog became so dense that her pilot decided to anchor. * * * Two anchor lights were properly set, indicating, under rule 2, a vessel more than 150 feet long at anchor, and a fog bell was regularly sounded as required by rule 15, until the collision. There was a strong southeast wind blowing, so that the Hesperides lay heading generally towards the southeast. While so lying at anchor the fog whistle of a steamer approaching from the south was heard, and about 11:36 p. m. the steamer Persian under way came into collision with the Hesperides, hitting her near the stem with the Persian's bow and causing damage to both vessels.

"The Persian that night was bound from Philadelphia to Boston. Her witnesses state that she encountered thick fog before she reached the Pollock Rip Light Vessel. She passed near the light vessel and Bell Buoy No. 1. Her captain testifies that shortly after passing the bell buoy she was put on a course N. E. by N. ½ N. This course would take her about half a mile east of the Pollock Rip Shoals Lightship. She was proceeding carefully, stopping several times and then proceeding ahead slowly. She met and passed the steamer Whitney to the west of and before reaching the Whistling Buoy No. 2. After passing the Whitney, and while the whistling buoy was distinctly heard to the eastward of the starboard side of the Persian, a bell of a vessel was reported by the lookout. The engines were stopped. A white light was then reported on the starboard side of the Persian. The engines were immediately started and her wheel starboarded; the captain testifying that he supposed the light was on a schooner or small vessel and that he would pass the schooner on his starboard side. Immediately a white light was reported on the port bow. Perceiving that the two lights were anchor lights on a large vessel directly in front, the engines were ordered full speed astern, but almost immediately, perceiving that the Persian still forged ahead, and that a collision was inevitable, the engines were ordered full speed ahead and the wheel put hard aport. This swung the Persian around so that with her port bow she struck the Hesperides a glancing blow near the stem."

The district judge held the Persian in fault because after the lookout reported the sound of the Hesperides' bell ahead she was not navigated with sufficient caution, in that her captain immediately assumed that the first light he saw was an anchor light on a schooner or small vessel and ordered the engines ahead to pass the supposed schooner on his starboard hand. The southeast wind swung the Hesperides towards

the northwest, so that the stern anchor light was further away than the bow light. The district judge found that:

"For the captain to have assumed, on seeing one anchor light, that the vessel was a small one and to have instantly started ahead at increased speed under a starboard helm, only changing the course enough to pass a small vessel, was, in my opinion, not navigating with caution until danger of collision was over."

He did not find the Persian guilty of faults charged in the libel, viz., proceeding at too high rate of speed in fog, not keeping a proper lookout, and failing to hear the bell of the Hesperides. The evidence did not sustain any such charges. That the speed of the Persian was moderate was manifest from the circumstances that between sighting the bow and the stern anchor lights there was time enough to starboard the helm, to put the engines in motion, and to get the steamer under stronger way than she already had while drifting under stopped engines. That an earlier stroke of the bell was not heard is easily accounted for by the direction of the wind, possibly also the earlier stroke synchronized with a fog blast from the Persian's whistle.

The district judge held the Hesperides free from fault. The gap indicated by asterisks in the first quotation, supra, from his opinion contains the following:

"(After he decided to anchor) her pilot testified that he headed the steamer to the northeast and proceeded in that direction for twenty-two minutes under a slow bell and then anchored. Her exact situation, as afterwards ascertained, was about half a mile northwardly from the Whistling Buoy No. 2."

Elsewhere he finds that she was anchored at least half a mile to the eastward of the range from the Pollock Rip Light Vessel to the Pollock Rip Shoals Light Vessel; that she was not anchored on any range, or in any fairway, but in the open ocean. It will be most convenient first to consider the evidence touching the actual position of the Hesperides as she lay at anchor.

The testimony first to be considered is that given by those on board of the Hesperides. Her pilot, Quinn, testified that he passed the Pollock Rip Shoals Lightship on the starboard hand as near as it was safe to go, and laid the regular course S. by W. ¾ W. (about S. S. W. by compass) intending to pass through the slue. There was a bank of fog ahead. He could not see Monomoy Light, or the Pollock Rip Lightship, or the gas buoy, or anything. He held his course for about a mile, when he ran into fog, at that time hearing the Whistling Buoy No. 2 broad on his port bow. This buoy lies about one-half mile to the eastward of the range between the two lightships. Considering it dangerous to run any longer, he starboarded, changed direction till he got the wind on his starboard bow, passing the buoy on his starboard and running on till about a mile from it, when he anchored at a place which he marked on the chart with an A. Moss, the captain, substantially corroborated this. He it is (not the pilot) who made the statement quoted by the district judge that the steamer ran 22 minutes to the northeast under a slow bell before anchoring. He said the whistling buoy was first heard a little on the starboard bow (the pilot put it broad on the port bow), explaining that it is a most difficult

thing to place and get the bearings of a sound in a fog; that "if a dozen men would try to take the bearing of a sound in a fog it would not be alike—one would differ from another."

Helby, the first officer, testified that after passing the lightship they altered the course to N. E. about 10:28 or 10:38 p. m., the buoy then being nearly ahead or a little on the port bow according to the sound, and kept on till 11 p. m., when they anchored, after going on the new course as he estimated about three miles. Shaw, the first officer, did not come on deck till they were about to anchor, was not there, when they passed the lightship, and did not know when they changed the course. All this testimony as to place of anchorage is unpersuasive, it grossly exaggerates the distance run by the Hesperides on her new course; if she kept on for 22 minutes, as the captain testified, or until she reached the point A marked by the pilot, she would have been far to the eastward of the whistling buoy, more than three-quarters of a mile from the range. The entire testimony of the unprejudiced witnesses hereafter referred to flatly contradicts any such hypothesis.

From the deck of the Hesperides we have also some testimony as to the depth of water at her anchorage. This, if clearly established, would be important, because the chart shows 6¾ fathoms on or near the range where the appellants contend she lay and about 8¼ near the mark A. The weather conditions at the time would increase these figures about a fathom. It was the practice generally on the Hesperides to find the depth of water when she came to anchor in order to give the chief an idea of the depth; that was the third officer's duty. Accordingly, Helby, the third officer, worked the sounding lead himself just after she came to anchor. The marks (bits of bunting) on the lead line were at 2, 3, 5, 7, 10, 13, 15, 17, and 20 fathoms. Between 7 and 10 fathoms there were no marks at all. One has to estimate. Helby cast the line from the upper bridge. It was dark and foggy, and he determined the location between 7 and 10 with his hand and mouth. He says:

"On account of the fog, believing I had the wet, I felt down with my mouth to the wet and took the line and judged accordingly."

He found the wet between 7 and 10, close to 7, estimated it at 7½ fathoms, and so entered it in a small memorandum book which he carried in his pocket from which to record entries in the scrap log. Dispute arose as to this sounding, and there is no entry of it in the scrap log; the witness accepting the statements of the captain and pilot. The chief officer's log gives the depth 9½ fathoms; the official log 9 fathoms. The chief officer's log was written up the afternoon succeeding the collision. Finding no sounding on the scrap log he asked the third mate, who kept it, "How many fathoms?" and he said, "7½." He testified further:

"I went and asked the captain how many fathoms of water we got, and he said, '9½.' I said, 'The (third) mate says he got only 7½.' He said, 'yes.' And the pilot said, 'There ought to be 10 here, and we got 9½ fathoms.'"

The captain's narrative is as follows:

When about to anchor, "I asked the pilot: 'How much water have you got here? Nine fathoms we ought to have.' And I sung out to the chief

officer from the bridge telling him 9 fathoms of water. He sent the third officer to take soundings (who) reported 7½. The pilot said: 'That is nonsense; we must have at least 9 fathoms.' After the collision, * * * I took the lead line and dropped it over the side and took the correct sounding myself, before the two pilots Quinn and Horton and the chief engineer, and we got 9½ fathoms of water. I took the sounding on the upper deck, the lower part of the bridge."

Horton was the Hell-Gate pilot and Quinn's partner, who came on deck just as the collision occurred. The chief engineer who testified was not questioned on this point. Quinn and Horton corroborate the captain, although Quinn places the second sounding before the collision. They estimated the depth from the distance the 10-fathom mark was above the water. Horton says the sounding was taken by the third or fourth officer. Of these conflicting soundings it may be noted that one was taken by a person in the discharge of his routine duty, without any expectation as to what depth he would get, and the location of the wet was determined, as he said, in the only way it can be done in the dark, by feeling with the hand and mouth. The other was taken after the collision by persons having a pre-conviction that it would show a certain depth, and the location of the wet was determined by an estimate of the distance a bit of bunting, viewed from above, was above the surface of the water. The fog was apparently as thick and the light as obscure at the time of the collision as it was at the time of anchoring, but the pilot said they had a lantern over the side.

There is also testimony from the deck of the Hesperides as to observations taken the morning after the collision. Because of the change of the tide (and perhaps a shift of wind) she then headed N. N. E. and got under way under a port wheel which swung her off further to the eastward. Pilot Quinn testified that "when it cleared" the next morning, he made the whistling buoy by actual bearing S. ½ W., having estimated it by sound the night before at about S. by W. ½ W.; and that the Hesperides then lay almost exactly on the line from the buoy to Pollock Rip Shoals Lightship. He testified:

"I could see we were right on the line between the two. I could see the buoys down below; the bell buoy and the gas buoy and the Pollock Rip Lightship and the Whistling Buoy, and the Pollock Rip Shoals Lightship and also the red buoy No. 2."

Had this panorama unfolded while the Hesperides was still riding at anchor, and had bearings been then noted, this evidence would be more important; but such seems not to have been the case. The pilot does not say she was at anchor when he took the bearings, and the evidence of the captain indicates she was then under way. He was asked the question whether when he got under way the morning after the collision he saw the whistling buoy. He replied:

"After we got under way in the morning it was not exactly clear, it was clear enough to get under way, and shortly after we got under way the chief officer reported the whistling buoy. We heard it before we saw it on the starboard bow, a little on the starboard bow. We were then steering south by east by compass; I think it was that. (Evidently the Hesperides had swung under the port wheel considerably to the eastward from her heading at anchor of N. N. E.) The bearing of the sound was about south

by compass, on the starboard a little. We passed it (the buoy) close on the port side. We could then see it. Within half a minute after we heard the whistle we saw the buoy in going ahead, around the ship. We passed close to it, and could distinctly see it.".

Corroboration of this is found in the testimony of pilot Quinn touching the movements of the steamer Silvia, which lay overnight well to the eastward of the Pollock Shoals Lightship:

"She was coming in from the eastward. It cleared out where he was before it did with me. He came to the lightship and passed me; circled right around me to anchor. He ran into the fog and came back to the lightship, and then he turned around again, and it cleared again when he got there; and I had started my anchor up and he was coming down on that course from one lightship to the other, and I steamed right ahead and got in ahead of him—we got under way before he got down to us."

We are satisfied that the proof does not show that the location of the Hesperides while at anchor was taken by range that morning.

We do not think it necessary to examine in detail the testimony as to the course of the Persian. After passing the bell buoy, she was headed a little to the eastward of the regular course for Pollock Rip Shoals Lightship to counteract the effect of wind and tide which tended to carry her to the westward and to make a clearance for any vessel which might be encountered navigating in an opposite direction. We prefer to take the position of the Persian at the time of collision, not from her witnesses, but from the independent testimony of those on the Whitney who passed her just before collision.

Upon the disputed question as to the location of the Hesperides we are fortunate enough to have two independent groups of unprejudiced witnesses. The first of these came from the Hamburg-American Line steamer Silvia. She was bound from Boston to Baltimore. Fog set in, so she anchored for the night a mile and a half or more E. N. E. of Pollock Rip Shoals Lightship. In the morning at daylight she got under way and then saw the Hesperides at anchor. There is some dispute between her captain and second officer, and her pilot O'Brien, who is another partner of pilot Quinn. It will not be necessary to discuss their testimony in detail, because upon the argument counsel for the Hesperides submitted a fragment of chart on which he had indicated the locations testified to by different witnesses. Upon this "G" is stated to be the "anchorage of the Hesperides as given by German witnesses," and G is substantially on the range between the two lightships.

Finally we have the testimony from the steamship Whitney. Her captain, who had held a master's certificate for 19 years, and during that entire time had been engaged in coast-wise navigation in the vicinity of Boston and Pollock Rip, testified that he left Boston on June 29th bound for New York. In the vicinity of Pollock Rip Shoals Lightship they ran into a dense fog, picked up the lightship, and passed it on the starboard hand, very close, about 100 feet off. He took his departure about 11:30 or 11:35 p. m. from the lightship on their regular course S. S. W. The exact compass course to the Pollock Rip Lightship is S. by W. ¾ W. He steered a quarter point more westerly because when they go into the slue in the night they go well to the westward of the bell buoy. He said:

"S. S. W., I think, would take our ship right to the west of Pollock Rip Lightship. We wouldn't change our course at all. We go in there a hundred times in a year and we don't vary an inch from S. S. W. unless there is a strong tide running from the westward. Then we go south by W. ¾ W. (this is by our compass); all ships' compasses are not alike. * * * By our compass we go in a thick fog a great many times in a year, and we go S. S. W. and go just as near the lightship as we can get, and it will carry us to the other lightship. We don't alter our course once in a dozen times, and I have run the Yale through there on the same courses."

When about three-fourths of a mile beyond the Pollock Rip Shoals Lightship he heard the bell of a steamer. He thought at first it was on the starboard bow, slowed down, and stopped his engines, but soon discovered it was a little on the port bow, put his wheel hard over to port, and passed her very close. He estimated the distance at 200 feet—could see her lights through the fog but not very distinctly. This vessel was pretty near the range line running between the two light-ships, on the direct track of all vessels, very close to it. Before passing this anchored steamer he had heard the whistle of another steamer which he took to be the Persian, because he knew she was due about that time and could tell most generally the whistles of the different steamers he was familiar with.

When he had got one-fourth mile, possibly one-half mile, beyond the anchored vessel, he passed this steamer on his port hand very close, could see her white lights, but not the colored lights. She was going very slow and stopped for him. He thought at the time that if she kept the course between the lightships she would be likely to run into the anchored vessel.

O'Donnell, chief officer of the Whitney, was on watch in the pilot house with the captain. He testified that, dense fog having set in, they passed close to the Pollock Rip Shoals Lightship (on their starboard side) so as to get a departure to go down to the other lightship; he did not remember whether the course was S. S. W. or S. by W. ¾ W. Some little distance below, having kept a straight course meanwhile, he heard the bell of an anchored vessel, very nearly on the port bow. The wheel was put hard aport to clear her, and almost immediately after hearing the bell he saw her lights. They passed her on their port hand not over 200 feet away. After passing their course was S. by W. ¾ W., and after going as he thought not over ½ mile they passed the Persian on their port side. He knew her whistle, having served on her as second mate. He passed her near enough to see her lights. She stopped her engines. He heard the answer signal in her engine room. He said:

"The anchored vessel was on the range line, in my way of thinking."

We see no reason to discredit this very specific testimony. The witnesses were disinterested. They had committed no fault of navigation and were charged with none. They had been involved in no catastrophe. They were experienced navigators familiar with the locality. There is no reason to doubt that they made departure from a point close to the upper lightship, nor that they held a course which would bring them to the lower lightship as it had hundreds of times before. She certainly passed the Persian, for the navigators of that vessel

corroborate her officers as to the details of such passing. Nor is there any doubt that the anchored vessel, which the Whitney passed, was the Hesperides. There is no suggestion of any other vessel in the vicinity except the Persian. Moreover, full corroboration of the story of the Whitney's officers comes from the Hesperides. Pilot Quinn says that a steamer which subsequently exchanged whistles with the Persian passed down to the westward of him. Cornwall, chief engineer, says a steamer passed, which he knew was a Metropolitan boat because he could see her, although he couldn't tell which one she was. The captain says that the steamer which passed while he was lying at anchor had to alter her course to pass. Helby, third officer, says a vessel passed them at anchor, but he did not take notice of the heading. Clucas, who attended to the anchor lights, says that while they were hoisting them a steamer went by under their stern, blowing fog whistles. The chief officer says a steamer passed "up under the stern," and he could just see the loom of the lights. It will be remembered that the Hesperides lay at anchor with 60 fathoms of cable, head to the wind, pointing towards the S. E.

We are satisfied that the Whitney held a range course, and that, in the short time which elapsed after leaving the lightship, she did not get off her course to the eastward with the wind and the set of the tide tending to carry her to the westward. We conclude therefore that the Hesperides was anchored substantially on the range between the two lightships on the direct track of vessels navigating up and down the coast in the locality.

Her counsel, however, contends that even if she rode at anchor on the range she committed no fault in so doing, since at this upper entrance to the slue there is open ocean to the eastward; that decisions holding vessels in fault for anchoring in a thoroughfare of a narrow river or channel or in a crowded harbor do not apply. One of his witnesses refers in illustration to a range between Fire Island and Sandy Hook, 180 miles; but we have no such case here. The fairway for deep-draft vessels navigating up and down this part of the coast lies for miles through dangerous shoals. It is a tortuous one with abrupt turns and short reaches, and the government has expended a great deal of money in charting, buoying, and lighting it, so that vessels proceeding about their lawful business may travel it in safety provided they give proper attention to the aids to navigation thus provided. Referring to the immediate locality, a glance at the Eldridge chart put in evidence shows that from Handkerchief Lightship to Shovelfull Lightship the course is N. E. by E. for 4⅞ miles; from Shovelfull to Pollock Rip Lightship the course is E. by S. ⅜ S. for 3½ miles; from Pollock Rip Lightship to Pollock Rip Shoals Lightship the course is N. by E. ¾ E. for 4½ miles. By daylight, or when the night is good for seeing lights, a vessel may take its departure from one lightship and head for the next one; but when all lights are obscured her navigator can proceed with safety only by following the compass course, which will bring him to the next point where he can be sure of his location. To assist him in picking his way, sounds as well as lights are provided. At Handkerchief Lightship there is a bell and another bell at Shovelfull, at Pollock Rip Lightship a steam

whistle, and at Pollock Rip Shoals Lightship a steam chime whistle. Along the way are flash buoys, red and white, bell buoys and whistle buoys, all intended to indicate the thoroughfare, which government hydrographers have sounded and charted to accommodate vessels, which have occasion to pass from points above to points below this dangerous part of the coast. The path of safety here is the indicated path. We should be inclined to think it imprudent navigation for a pilot, coming out of the north mouth of the slue bound for Pollock Rip Shoals Lightship, to run off in dense fog to the eastward into the open ocean, expecting to guess rightly, when to stop and turn westward again to make his immediate destination. Moreover, in that very open water to the eastward, withdrawn from the range, he might expect to encounter the vessels, which had elected to anchor while the fog lasted and to do so had betaken themselves to a place out of the direct track of vessels coming into or going out of the slue. We are of the opinion therefore that in anchoring, in this dense fog, substantially on the range, and in the direct track of vessels, instead of hauling off to the eastward so as to leave the thoroughfare unobstructed, the Hesperides committed a fault of navigation which directly contributed to bring about the collision. Bits of testimony found here and there in the record indicate that navigators appreciate the importance of leaving the fairway on ranges unobstructed, where navigation is as confined as it is in this locality. Helby, third officer of the Hesperides, says that pilot Quinn when he changed course to the N. E. told him that he did so because the weather was very thick, they were right in the very way of traffic, and he deemed it prudent to anchor. The pilot himself, who insists that the Hesperides was anchored a half mile further to the eastward than we have found her, says that he hauled out there to get off the regular line if anything was coming, and that he would not consider it wise to anchor his boat in a fog as thick as it was that night directly on the range line between the two lightships. The Silvia anchored a mile and a half to the E. N. E. of the upper lightship. Her pilot (Quinn's partner), after much fencing on cross-examination, admitted that a prudent man would anchor where he did rather than down on the line. The captain and chief officer of the Whitney said that the range was not a safe place to anchor.

We have not overlooked the fact that in The H. F. Dimock, 77 Fed. 226, 23 C. C. A. 123, the Court of Appeals of the First Circuit held the yacht Alva free from fault when at anchor in a fog in Pollock Rip Slue. In that case the damages sustained by the yacht were so large relatively to the stipulated value of the colliding vessel that the court thought it unnecessary to examine the question; if she were in fault it would not change the result. In consequence the Court of Appeals merely affirmed the District Court on this branch of the case, and the opinion contains no statement of the special circumstances which induced the Alva's acquittal from all charges of fault. Since that decision this court has twice indicated that when dense fog obscures a waterway through which there is a well-defined track for moving vessels prudence requires vessels then moving therein to continue with extreme caution, availing of such sights and sounds as they can make out till they reach some anchorage to which they can withdraw from the regular track, leaving the thoroughfare unobstructed by their pres-

ence. La Bourgogne, 86 Fed. 475, 30 C. C. A. 203; City of Lowell, 152 Fed. 593, 81 C. C. A. 583. Other authorities which may be consulted are The Benjamin A. Van Brunt, 98 Fed. 131, 38 C. C. A. 668; The Patience (D. C.) 167 Fed. 855; The Passaic (D. C.) 76 Fed. 460; The Milligan (D. C.) 12 Fed. 338; The James D. Leary (D. C.) 110 Fed. 685.

Since the majority of the court concur with the district judge in finding the Persian also in fault, it is unnecessary for the writer to indicate the reasons which induce him to reach a different conclusion.

The decrees are reversed, with half costs of this appeal to the Persian, and cause remanded, with instructions to decree in conformity with the views expressed in this opinion.